## No. 13,550.
### GEORGE W. PIERCE vs. D. C. HEDDEN.

### SYLLABUS.

1. Two leases of the same property were made between the same parties, the first for the single month of February, the second for seven months. A right was granted in the second lease to the lessee to make the repairs needed to place the premises in proper condition. The lessee, to the knowledge of the lessor, made repairs during the first lease. Before the expiration of the first lease, the building was condemned by the city authorities and demolished; both leases being thereby dissolved. *Held*: The lessor is liable to the lessee for the expenditures made by the latter for repairs and other necessary purposes. The prematurity *quoad* the commencement of the second lease in the making of the repairs is no bar to the recovery for the outlays made for that purpose.

2. Parties in an act of lease can legally broaden or restrict the rights and obligations in respect to warranty. A non-warranty clause covering apparent defects or those communicated ·by the lessor to the lessee is valid; such a clause can be made to extend to hidden defects, the seriousness and consequences of which the lessee could not then have well measured, provided the lessor was ignorant of them and it was thoroughly understood that the lessee took the premises such as they were and expressly at his risk and peril. The clause could be set aside for fraud if the lessor knew of them or could have foreseen them at the moment of the contract. In case of doubt as to the scope of the clause, the doubt should be resolved against the lessor.

3. It is not to be presumed that the lessee assumed the risk and consequences of defects so radical as to call for the condemnation of the premises as dangerous to the public safety, thereby dissolving the lease.

A PPEAL from the Civil District Court, Parish of Orleans—*Ellis, J.*

*Boatner, Dodds & Boatner* for Plaintiff, Appellee.

*Parkerson & Tobin* for Defendant, Appellant.

The opinion of the court was delivered by NICHOLLS, C. J.

### STATEMENT OF THE CASE.

NICHOLLS, C. J.    Plaintiff alleged that on the 6th of February, 1899, he entered into a contract of lease with D. C. Hedden, acting for himself and as agent of H. H. Hedden, of certain described premises known as No. 700 Poydras street; the said lease to extend for a term of seven (7) months, commencing on the 1st day of March, 1899, and ending

on the 30th day of September, 1899; the rental of said premises, stipulated in said lease, being the sum of fifty ($50) dollars per month, for which petitioner executed his seven (7) promissory notes, each for the sum aforesaid; one due on the 1st of April, 1899, and the remainder monthly thereafter; that said premises were leased for the purpose of conducting a saloon business therein, and that, in order to prepare the same for occupation to commence the business at once, he leased the same premises from said Hedden for the month of February, commencing on the day the lease was signed, and paying the rent therefor; that he was immediately thereupon placed in possession of said premises, and made the repair thereon necessary to put the building in suitable condition for the business to be conducted therein; that he set up his bar fixtures therein and commenced the business for which he had leased the property; that at the time of the execution of the lease, the building had been condemned by the authorities of the city of New Orleans as dangerous, and the said D. C. Hedden had been served with notice to demolish the same, of which fact petitioner was entirely ignorant; that Hedden leased the premises to petitioner with a full knowledge that the same had been condemned as dangerous by the authorities, and that it would be demolished, but concealed the same from petitioner.

That the action of Hedden in concealing said facts and in leasing petitioner the property was fraudulent and in bad faith; that shortly after petitioner took possession of said leased premises, and after he had made the repairs aforesaid, and commenced business therein, he was notified by the city engineer to remove therefrom, in order that the same might be demolished; that he immediately notified D. C. Hedden of the notice aforesaid, and called upon him to protect petitioner in the occupation of the leased premises; that Hedden failed and neglected to do so, and petitioner was compelled to abandon and surrender the same, and said building was thereafter demolished by the city authorities; that he had been damaged in the sum of $2481.50 by the failure of D. C. Hedden to protect him in the possession and enjoyment of said leased premises; that he had expended the sum of $111.50 in making necessary repairs, fixing the roof, banquette or sidewalk, papering the premises, etc., and the profits of the business to be conducted therein would have amounted to the sum of ten ($10) dollars per day, on an average, from the commencement of the lease on the 1st of March to the termination thereof, on the 30th of September, 1899; that in addi-

tion to the above damages petitioner was at an expense of one hundred ($100) dollars in the removing of bar fixtures, setting the same up in the premises and removing the same afterwards, under the order of the city engineer, making the total damages suffered by petitioner $2481.50, upon which he was entitled to recover legal interest from judicial demand.

In view of the premises he prayed for judgment against him for the aforesaid sum, with legal interest from judicial demand.

Defendant answered, pleading first the general issue. Further answering, he admitted the execution of the lease as set out in the petition on 6th of February, 1899, and averred that said lease contained the following clauses:

"The saloon and premises are taken as they are in their present condition for his own use and service at his own expense"; and the lessors will not be responsible for damage caused by leaks in the roof, or by any vices or defects of the leased property.

He specially denied that the building was condemned. He alleged that plaintiff took possession of the premises and proceeded to make alterations and repairs without obtaining a necessary permit therefor from the city engineer; that he was notified by the authorities to desist, but in spite of such notification he persisted in the work, and was arrested and fined by the recorder; that, had the plaintiff occupied the said premises lawfully and complied with the city ordinances he would not have been disturbed during the term of the lease; that by reasons of his own unlawful acts and doings he not only was deprived of the use of the premises himself, but caused loss and damage to defendant in the rental of this and other properties.

The district court rendered judgment in favor of the plaintiff for the sum of three hundred and eleven dollars, with legal interest from judicial demand. Defendant appealed.

Plaintiff prayed in the Supreme Court that the judgment be amended by increasing the same to the sum of two thousand four hundred and fifty-one dollars and fifty cents.

## OPINION.

The evidence shows that upon the 6th of February, 1899, a written contract of lease was entered into between D. C. and H. H. Hedden and G. W. Pierce of the saloon and appurtenances No. 700 Poydras

street, for the term of seven months, commencing on the 1st day of March, 1899, to the 30th of September, 1899.

The lease declared "the saloon and premises are taken as they are, in their present condition, and the lessee agrees to keep them in good condition for his use and service at his own expense. The roof and floor are to be repaired or renewed at lessee's expense * * *. The said premises and appurtenances, including the locks, keys and other fastenings, are delivered in good order, and the lessee obligates himself to keep the same in like good order during the term of the lease; to keep the chimneys and privies clean, and to comply with all the city ordinances at his own expense. The lessee binds himself to make no alterations * * * without the written consent of the lessors * * *. The lessors will not be responsible for damage caused by leaks in the roof or by any vices or defects of the leased property."

On the 31st of January, 1899, G. W. Pierce had written to D. C. Hedden: "I will rent from you for the month of February, 1899, the saloon No. 700 Poydras street, and allow you to enter the saloon and premises on any day with your attorney and auctioneer, to hold at said saloon a public sale of the fixtures and furnishings of said saloon, *i. e.,* the contents of said house will be subject at any time to be offered by you at public auction by the sheriff.

"If the fixtures and furnishings are removed from the premises, then the rent for the unexpired part of the month is not to be exacted from me. The rental is fifty dollars per month. The lessee is not liable in any way or manner for damages on account of the auction sale."

At the time this letter was written, the fixtures and contents of the saloon were under provisional seizure, the lessee at that time, one Guillotte, being in arrears for his rent. We do not find any written acceptance of said offer, but the evidence shows that it was, in fact, accepted and Pierce went into possession under it on or about the 6th of February. Plaintiff says in his pleadings that the (second) lease "was for the purpose of conducting a saloon business on the premises, and that in order to prepare the same for occupation to commence said business at once, he had leased the same premises from Hedden for the month of February, commencing on the said day the lease was signed and paying the rent therefor in advance."

A sale of the fixtures in the premises was made some time in February (10th of February), we should judge from the testimony, about

ten days after the lessee took possession, under the first lease, and at said sale Pierce himself bought them in, but sent them away.

On February 10th, 1899, W. L. McGary, Commissioner of Public Works, wrote to D. C. Hedden that these premises (the one story building on the upper swamp corner of St. Charles and Poydras streets) had been examined by the city engineer and found to be in a dangerous and dilapidated condition, and had therefore been condemned, and that as this property belonged to him he notified him to cause this property to be demolished within three days from the notice.

On the 21st of February, 1899, he wrote to him again, saying that notwithstanding the notice given him and his promise to comply with same, he had but partially demolished the building and he notified him that should he fail to remove the balance of the unsafe building within · twenty-four hours from service of his letter, he would proceed to demolish it and take necessary steps to recover costs.

We presume that the building was taken down, but the record does not show it. This action of the city authorities seems to have been brought about by Pierce's making some repairs upon the building without having obtained prior to doing so a permit from the city authorities. · P. J. Flanagan, a building inspector of the city, some days before the 14th of February, 1899, noticed repairs being made upon the building by a carpenter named Green, who had been employed by Pierce to make them, and was told by the latter that he did not know whether they were being made under a permit or not. He reported the fact to his superior officer and was directed by him to enquire into the matter. Hedden, on being told of the conversation between Green and Flanagan, applied to the city authorities for a permit to continue the repairs, but the permit was refused and the orders to demolish the building were given as stated. Flanagan stated that at the time he spoke of, a large section of the corner of the building at both streets had been cut away. "It seemed the corner of the house was being cut away, and besides that all the old canvas was nearly on."

Flanagan said that Pierce or his workmen continued to work in the night time and to stop him he (Pierce) was arrested and fined five dollars; that the only work done, that he knew, after notice was nailing canvas on the roof and putting in bar fixtures.

Pierce testified in one place that he occupied the premises until three days after Mardi Gras (Mardi Gras was the 14th of February, 1899); that he occupied them about eighteen or twenty days, but he was not

sure. In another place he testified he thought he first went upon the premises on the 1st of February; that he commenced making the repairs as soon as he went in, three or four days after he got in, and he was interrupted in making the repairs on the 14th of February; that he did not get a permit to make the repairs—he did not think it was necessary.

It will be seen from this that all the repairs which were made were made in the month of February, during the continuance of the first lease, and before the second lease had commenced, and that the fixtures were placed in the building at night after the repairs on the building had been ordered to be stopped. The first lease (that for the month of February) was dissolved by the destruction of the building, prior to the time fixed for its expiration, and by reason of the destruction of the building before the date for the commencement of the second lease had been reached, the latter never went into operation.

Plaintiff insists that the building was subject to condemnation at the time it was in fact condemned as an unsafe building and ordered to be demolished in June of 1897; that Hedden had knowledge of that fact and had concealed it. He offered in evidence a letter of date June 22, 1897, from the city engineer to the Commissioner of Public Works, informing him that this building had been examined and found to be in a dangerous and dilapidated condition, and had therefore been condemned. That the building was beyond repair; that the owner should be ordered to demolish it at once. He placed John Chaffe, messenger for the Department of Public Works, on the stand, who testified that he had, on the 23rd of June, 1897, served a copy of this letter on Mr. Hedden, by leaving the same at the latter's office. That there were two gentlemen in the office at the time whom he did not know, but that he had been told on enquiry that Mr. Hedden was in his office. Hedden testified that he was not in New Orleans at that time; that his office was then closed and locked. He said that shortly after the date of this letter (about the 4th of July, 1897), he met Mr. Pilie, City Building Inspector, by chance on the street, who asked him whether he was the owner of the property, and on his saying he was, he told him he would have to repair it; that he subsequently obtained a permit and had the repairs made; that he was told the only part condemned was a shed upon the front, and that this was repaired. He offered in evidence a copy of the permit referred to. He testified that he had no knowledge that the house was condemned and concealed nothing from Pierce, who made a personal inspection of the premises. In respect to the lessee's repairing the

house he testified that he was not present when Pierce made the re-
pairs; that he did not know much about the repairs; that so far as they
were concerned, Pierce was to do the repairing; all he was to do, ac-
cording to what he told him, was to repaper the place and repair the
roof; that was all. That three or four days after this Pierce went to
witness' office about the flooring and asked him to recommend a car-
penter; that he (Hedden) said that Green, a neighbor of his, could do it,
and he would get him to do it; that Pierce said that Green would charge
him but forty-five dollars, and he asked "was that a reasonable charge?";
that he replied, "that he thought it was"; that as he left the office he
said, "Mr. Hedden, I am going to paint the place," and witness replied,
"All right," and that was the last he heard.

He testified further that the lease he made to Pierce was identical
with leases he made of his property in the same neighborhood to other
parties, and that it was upon a printed form. He did not controvert the
rightfulness of the order of condemnation of the building, made in
February, 1899, nor did he attempt to show that the condition of the
building which gave rise to that order was due to the work done upon
the same by Pierce. The latter testified that his daily profits during
the time he was on the premises was about twenty-two dollars; that at
the lowest estimate they would have been ordinarily about ten dollars;
that he had kept an account of his sales and profits during that period,
but that he had moved about so much he had lost his books. His claim
for profits rests upon this vague statement, which is supported by *data*
of no kind. Referring to the expenditures he had made for repairs, he
first stated in a general way "about four hundred dollars," but when
pressed for particulars, stated he had receipts for the flooring and roof
—ninety-eight dollars for the flooring and eighteen dollars for the roof;
that in addition to this "there was the hauling and moving around and
such like." Later on, he testified that the hauling of the fixtures to the
pavement had cost him about eighteen dollars, and removing them about
twelve, and the carpenter's bill for putting them up and then taking
them down was about forty dollars; that he sent away those he bought
at the auction and replaced them by others.

Plaintiff's counsel in their brief say: "He took possession under the
lease and proceeded to make the repairs, for which it provided, to-wit:

'Ninety-eight dollars for the floor and eighteen dollars for the roof.

'Moving out of old fixtures and putting up of the new, seventy dol-
lars.

'Revenue license, twenty-five dollars.

'Paper-hanging, twenty-five dollars.

'Electric lighting, fourteen dollars.

'Making in all for actual expenses incurred in moving in and moving out the sum of two hundred and fifty-two dollars.' "

We think plaintiff's demand for profits is not supported by the evidence; we need not discuss therefore what the law applicable to the situation would have been had the evidence justified the claim. Granting that plaintiff's daily profits, during the short period he occupied the premises, was about twenty-two dollars a day; the profits of that particular period would have formed no basis for profits generally, for it was just at and about the time when the city was crowded with strangers visiting it for the Carnival. The proof of profits should rest upon something more than a mere general estimate.

Defendant insists in argument that the demolishing of the leased building was due to the fact that plaintiff was making repairs upon it. It is possible that the fact of the making of the repairs and of their being made without a prior permit, was the reason attention was attracted to it, which might have been otherwise overlooked, but there is nothing in the evidence going to show that the condition of the building was at all injured by the work caused to be done upon it by the plaintiff.

The building inspector, Flanagan, says of this work: "The improvements were remodelling an old shack to a respectable coffee house," but it would seem that, notwithstanding the making of these improvements, the building would still be in a dangerous condition and had to be torn down. Defendant claims that this work was not made under the provisions of the second lease, as it had not yet commenced, and he had no right to do it during the first lease

The two leases do not on their face refer to each other. On their face they are separate and distinct, having no relation one to the other. We think it exceedingly probable, however, that the first lease was, to the knowledge of both parties, made in contemplation of the second and for the purpose of placing the premises in better condition for plaintiff's business. The repairs were made, as the defendant said, "prematurely," so far as the existence of the second lease was concerned, but defendant was informed by Pierce that they were about to be made and he not only raised no objection, but when informed that they had been commenced

without a permit he unsuccessfully sought to have them continued, under a permit still to be obtained.

He made no complaint of the prematurity of the repairs at that time; we think it may be fairly presumed that if their making had been postponed until after the 1st of March, the parties would have been confronted by the same situation that they were when they had been made prior thereto.

We think the building would have been ordered to be demolished just after the first of March, while plaintiff would have been in possession under the second lease instead of being ordered to be demolished the latter part of February. The bad condition of the building unquestionably put an end to both leases. Defendant urges upon the court the clauses in the act of lease, reciting that the premises were delivered in good order; that the lessee took the premises as they were and agreed to keep them in good condition, for his use and service, at his own expense; that he bound himself to make no alteration in the premises and to the non-warranty clause by which it was stipulated that the lessors would "not be responsible for damage caused by leaks in the roof or by any vice or defects of the leased property."

The evidence shows that the premises were not, in fact, in good condition on the 6th of February, even though they may have had the appearance of being in good condition. That the repairing, renewal of the flooring and the roofing by the lessee was contemplated by both parties is obvious, for the contract declares expressly that he is to make them at his own expense. The clause as to making no alteration in the premises does not, therefore, cover a repair or a renewal of the roof or flooring. The lessee had the right to place the premises in good condition for his use and service, provided the same was done at his own expense. The demand for the expenditures made on this score would not have been advanced, we assume, had the lease gone to its full execution; the obligation and right to make the repairs was in view of the consequential benefits to be received by the lessee during the whole lease. The claim is not presented now as for a benefit received therefrom by the lessor, but by way, substantially, of damages to the lessee.

We do not give to the non-warranty clause the wide scope which the defendant does.

Article 2695 of the Civil Code declares that "the lessor guarantees the lessee against all the vices and defects of the thing which may

prevent its being used, even in case it should appear he knew nothing of the existence of such vices and defects at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee, and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."

The parties to a lease have the right, as have the parties to a sale, to broaden or restrict their respective rights and obligations as to warranty by a clause in their contract.

"Une telle clause n'a rien d'illicite lorsqu'elle a pour objet des vices apparents ou des vices dont le bailleur a donne connaissance au locataire. La clause de non garantie peut aussi comprendre les vices cachés, ceux dont le locataire en signant le bail n'a pu mesurer le gravité, et les consequences, mais c'est a la double condition que le bailleur en aura ignorer l'existence et qu'il aura été bien entendu que le locataire prenait le chose louée, telle quelle est a ses risques et perils. Le doute sur l'entendu de la clause de non garantie et l'intention des parties doit s'enterpreter contre le baileur. Ainsi quand les reparations faites a l'immeuble ont consistés en des reconstructions necessités par un vice caché encore bien qu'une clause particuliere du bail, l'oblige a souffir toutes les grosses et menues, reparations quelles que soient leur nature et leur durée sans pretendre a aucune indemnité, ni diminution de loyer. Si au moment du contract le bailleur connasait les vices de la chose ou pouvait les preévoir la clause de non garantie serait nulle comme entachée de dol." (Dalloz & Vergé, under Art. 1721 C. N., Nos. 28-29 et seq.)

We do not think the parties to this contract contemplated under its non-warranty claim that the lessees should have assumed the risk and consequences of defects in the premises so radical as to warrant and justify its being demolished, as being dangerous to the public safety, a vice so radical as to carry with it as a direct consequence the dissolution of the lease. We do not think the nesessities of this case require for holding the lessor to responsibility for damages on the ground that he knew at the time he made the lease of the existence of that defect and vice.

The lessor attributes the whole trouble in this case to the fact that the lessee, Pierce, undertook to make repairs without having first obtained a permit; that his making the repairs was a violation of the city ordinances, which he directly bound himself to observe, and, there-

fore, a "fault," and that this fault led up, as a consequence, to a condemnation of the building, as the building had been permitted to stand, without opposition, from 1897 to 1899, even if it had been in a dilapidated and dangerous condition, which was not admitted.

While the violation of the city ordinances was a "fault" on the part of the lessor, it was not a fault so directly bearing upon the contract as to cause the lessee to lose his recourse against the lessor; it may have occasioned the directing of the attention of the city authorities to the condition of the lessor's building, but it was not the cause of the condemnation; the house was demolished by reason of its bad condition; it only indirectly affected the result. If the building was dangerous it should have been demolished.

We are of the opinion that the judgment of the District Court in favor of the plaintiff was for too large an amount, and that it should be amended.

The plaintiff is not entitled to recover anything for taking down and removing the fixtures which he purchased in the building, nor for bringing in new ones; the latter were brought in after he was aware that the building would be demolished, and besides he would have had to remove them, at his own expense, at the termination of the lease. The period for their removal was simply advanced.

For the reasons herein assigned, it is ordered, adjudged and decreed that the judgment appealed from be and is hereby amended by reducing the amount thereof to the sum of one hundred and eighty dollars, and as so amended it is hereby affirmed.