THOMPSON, J.
 

 The plaintiff first above named sued to have a lease contract declared abrogated because of an active violation of the obligations of the lessors, and for damages in the, sum of $33,600 claimed to have been suffered by reason of the breach of the contract. The suit was filed May 24, 1924.
 

 The lessors, plaintiffs in the second named suit, then sued their lessee for rent amounting to $2,'700 and caused all of the movables found in the leased premises to be provisionally seized. ■ That suit was filed September 17, 1924.
 

 The suits were duly answered by the respective defendants and the two involving practically identical issues were consolidated for all purposes and tried as one suit.
 

 The trial resulted in a judgment declaring the lease dissolved and condemning two of the lessors to pay the lessee $400 damages. The demand of the lessors for rent was rejected.
 

 All parties have appealed.
 

 The property leased is located at No. 310 Texas street in the city of Shreveport. It is a two-story building, has for many years been used as a restaurant, and was formerly known as Vaky’s Café. The name was latex-changed to Grand Café.
 

 Dehan had been engaged in the restaurant business in the city of Shreveport for nearly two decades, and on December 27, 1922, entered into a written contract of lease with
 
 *809
 
 the owners of the property to be used as a restaurant for a term of five years beginning January 1, 1923, at a monthly rental of $450.
 

 The lease provided that the lessee should at his own expense keep up all of the repairs and make all replacements of whatsoever nature and kind, other than required on the roof, during the term of the lease; all such betterments and improvements which the lessee might see fit to make to become the property of the lessors without further consideration to the lessee at the termination of the lease.
 

 The lessee was placed in possession of the premises, renovated and placed the same in suitable condition to be used as a restaurant, made some necessary improvements, alterations, and repairs, and installed his fixtures and equipment, all at an alleged cost and expense of $14,500.
 

 His possession of the property and operation of the restaurant continued without interference or disturbance and with a fair return of profits, until about January 9, 1924, when, through the alleged unl'awiul acts and unjustifiable conduct of his lessors, his peaceable possession was interrupted and disturbed, and later the leased premises were invaded, the restaurant closed, and the lessee forced to vacate and abandon the property.
 

 • The interruption of the lease and ultimate vacation of the property was brought about in the following manner:
 

 The several lessors owned the leased property in indivisión, but in ^unequal proportions.
 

 Two of them, Mrs. Bettie Scott Youree and Mrs. S. Ilose Lloyd, also owned a three-story building known as the Phcenix Hotel which adjoined the leased building. The wall of the first two stories served as a partition or common wall between the two buildings.
 

 The two lessors just mentioned decided to tear down the Phoenix building and to replace it with another to be used as an annex to the Youree Hotel, which was also owned by them.
 

 They accordingly entered into a contract with certain contractors, who proceeded to demolish and take down the Phoenix building.
 

 Proceeding from the upper story, when they got down to the top of the second story it was discovered that the common wall was so defective, rotten, and unstable that it would be unsafe and dangerous to permit it' to remain after the support of the Phcenix building was removed.
 

 The condition of the wall was made known to the city authorities and, after due inspection, the wall was declared unsafe by the building inspector, who notified the agent of the lessors to remove the wall.
 

 Several conferences were had between the agent of the lessors and the lessee and his attorney, but without reaching any amicable arrangement or satisfactory result.
 

 In ■ order to remove the common wall and to replace or.reconstruct it, and at the same time to protect and support the leased building, it was necessary to erect a temporary shore wall on the inside of the restaurant. Por this purpose the agent of the lessors and their contractor and workmen assembled the necessary material and went into the leased premises prepared to begin the work of the temporary shore wall. The lessee protested very vigorously and forbade the work being done; then the agent and workmen withdrew. The guests of the restaurant went out and the building was locked up by the lessee.
 

 On the following clay the lessors obtained a writ of injunction against the lessee, restraining him from interfering with the lessors, their contractor, and workmen in removing the wall and replacing it with another.
 

 AVith this injunction in force, the work of installing the shore wall, the removal of the common wall, and reconstruction of another was proceeded with.
 

 
 *811
 
 About February 21, 1924, tbe building inspector of tbe city notified tbe lessors’ agent that tbe front wall, as well as the side wall, was deemed to be unsafe and would have to be taken down and rebuilt. This has reference to the brick wall of the upper story; the lower story having a plate glass and an iron column front.
 

 To remove the upper front wall and to rebuild, it was necessary to erect a scaffold over the sidewalk in front of the restaurant to protect the public from falling brick and material. The lessee again protested against placing the obstructions which prevented the entrance into his retaurant and against the removal of an electric sign attached to the front wall.
 

 Thereupon the building inspector ordered the building vacated until the front wall could be placed in a safe condition, and roped off the' sidewalk to keep people from passing in front of the building.
 

 The work of repairing the front and rebuilding the side wall continued until completed about March 21st, when the agent of the lessors notified the lessee that the building was ready for his reoccupancy under his lease. However, at this time, the temporary shore wall on the inside of ‘the building, which covered one-fifth of the restaurant space, had not been removed and a glass on the inside which had been removed had not been replaced. The lessee, though he. had been unable during the time of his enforced vacation of the property to get another suitable place in which to operate his restaurant business, declined to re-enter or to retake possession of the property, for the reason that the lessors had by their unwarranted acts put an end to the lease and practically destroyed his business.
 

 The property seized under the provisional seizure at the suit of the lessors was removed by the sheriff from the leased premises and stored in a warehouse, and we understand is still in the possession of and held by that officer under the writ.
 

 It is important to observe that the disturbance of the lessee's business began about January 9th, the invasion of the property by the lessors’ agent and employees took place on February 15th, and the actual dispossession of the lessee was accomplished on February 28th. The offer of the lessors to return the property to the lessee was made on March 21st.
 

 The first question to be determined is whether or not the acts and conduct of the lessors under the circumstances related had the effect in law of dissolving and abrogating the lease and justified the lessee in considering the lease at an end.
 

 It is undisputed that neither the lessors nor the lessee knew of the bad condition of the wall between the two properties. The vices and the defects of the wall were not discovered nor discoverable until the wall of the third story of the Phoenix building was practically removed.
 

 Nor is it disputed that the wall between the two buildings in its then defective condition would have served as ample support for both buildings and would have required neither reconstruction nor additional support during the entire term of the lease. It was admittedly the tearing down of the Phoenix building which brought to light and exposed the menacing and dangerous condition of the common wall and rendered its removal imperative.
 

 The obligations and rights of a lessor are defined in the several articles of the Civil Code under the heading, “Of Letting out Things,” some of which are very pertinent to the issues in this case.
 

 Article 2692 provides that the lessor is bound from the very nature of
 
 the contract,
 
 and, without any elause to that effect, to maintain the thing in a condition such as to serve for the" use for which it is hired and
 
 *813
 
 to cause the lessee to be in a peaceable possession of the thing during the continuance of the lease.
 

 2693. “The lessor is bound to deliver the thing in good condition, and free from any repairs. He ought to make, during the continuance of the lease, all the repairs which may accidentally become necessary; except those which the tenant is bound to make as hereafter directed.”
 

 2095. “The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.”
 

 2096. “If the lessee be evicted, the lessor is answerable, for the damage and loss which he sustained by the interruption of the lease.”
 

 2698. “The lessor has not the right to make any alteration in the thing during the eontin-' uance of the lease.”
 

 2699. “If, without any fault of the lessor, the thing cease to be fit for the purpose for which it was leased, or if the use be much impeded, * * * the lessee may, according to circumstances, obtain the annulment of the lease, but has no claim for indemnity.”
 

 2700. “If. during the continuance of the lease, the thing leased should be in want of repairs, and if those repairs cannot be postponed until the expiration of the lease, the tenant must suffer such repairs to be made, whatever be the inconvenience he undergoes thereby, and though he be deprived either totally or in part of the use of the thing leased to him during the making of the repairs. But in case such repairs should continue for a longer time than one month, the price of the rent shall be
 
 lessened in
 
 proportion to the time during which the repairs have continued, and to the parts of the tenement of the use of which the lessee has thereby been deprived.
 

 “And the whole of the rent shall be remitted, if the repairs have been of such nature as to oblige the tenant to leave the house, * * * and to take another house, while that which he had leased was repairing.”
 

 It is contended by learned counsel for the lessors that there is no place in the civil law for the cancellation of a lease because of necessary temporary disturbance or privation of possession due to the removal and rebuilding of a division party wall. That cancellation for temporary disturbance is not authorized by article 2692 of our Code (article 1719, Code Napoleon) which binds the lessor to maintain the thing leased and cause the lessee to be in peaceable possession; nor is such cancellation, say counsel, authorized by article 2695 of our Code (section 1721, Code Napoleon) which makes the lessor guarantee the lessee against vices and defects which prevent the thing leased being used.
 

 The proposition is" not supported either by the provisions of the Civil Code or by the jurisprudence of this court.
 

 It is true the several articles of the Code speak only of repairs in general and make no mention of reconstructions, but it is very clear, when all of the articles quoted are construed together, the obligation' is imposed on the lessor to maintain the leased property in a condition to serve the purpose for which it is leased; the lessor guarantees the lessee against all the vices and defects of every kind and character which may prevent the property being used. The lessor has not the right to make any alteration in the thing during the lease. If the thing ceases to be fit for use for the purpose for which it is leased, the lessee may obtain the annulment of the lease, and, finally, if the repairs have been of such a nature as to oblige the tenant to leave the house while the repairs are being made, the whole of the rent will be remitted; from which it follows as a corollary that, if the whole of the rent is 'remitted, the lease terminates.
 

 It has been said that repairs and reconstructions run so closely into each other that there 3s some difficulty in drawing the line which separates them.
 

 “The right to have the lease dissolved does not depend upon the degree of inconvenience to which the lessee is put. If the thing leased does not fulfill its object in consequence of some inherent defect, the action
 
 *815
 
 ex conducto will lie, although the inconvenience resulting from the defect may be too light "to authorize a claim for damages.” 2 Trop long due Louage, p. 6.
 

 In the case of Caffin v. Redon, 6 La. Ann. 4S8, the lessor sued his lessee for one month’s rent, the lease had three years to run. The lessee, in defense, prayed for a dissolution of the lease on the ground that there were inherent defects in the construction which rendered it dangerous and unfit for the use he had intended. The lessor admitted the building stood in need of repairs, but contended that the repairs had been begun and that the building would soon be put in perfect condition ; that he would indemnify the lessee for any loss he might sustain in consequence of the making of those repairs; and that the lessor under such circumstances had no right to have the lease dissolved.
 

 The question directly presented was whether the changes which the lessor made in the building were repairs or reconstructions rendered necessary by inherent defects. The court found that the house had been built little more than two years when the city surveyor informed the niayor that the construction was defective, the brick pillars of the wall were too light, were cracked and out of plumb, as also were the walls above them. The mayor ordered the lessor to prop the house, to take down the pillars and wooden lintels, and replace them with granite or iron, The lessor obeyed the instructions.
 

 The court stated that the fact that the necessary changes had been made and that the building was free from defects could not impair the rights of the lessee.
 

 “The taking out of the brick pillars and wooden lintels and replacing them with granite was in legal intendment, a reconstruction, and not a repair of that part of the building. The -inherent defect which made that reconstruction necessary entitles the defendant to a dissolution of the lease.”
 

 In the case of Coleman v. Haight, 14 La. Ann. 564, it became necessary during the lease to take down a wall of the house leased in order to construct a large building on the adjoining' property. The lessee abandoned the lease premises as uninhabitable.
 

 The court held that the lessee was justified in vacating the property and rejected the lessor’s demand for rent. The syllabus reads :
 

 “The failure of a lessor to maintain premises leased in a tenantable condition dissolves the lease, although such lessor be not at fault.”
 

 In the case of Henry Rose Mercantile Co. v. Smith, 139 La. 227, 71 So. 490, the court, in the course .of its opinion, said :
 

 “If the premises have ceased to be fit for the use for which they were leased, and the work' of restoration amounts to reconstruction and not to mere repairs, the lessee is entitled to revoke the lease.”
 

 In the case of Reynolds v. Egan, 123 La. 294, 48 So. 940, the walls of all of the rear of the house leased began to crack and open as the result of extensive excavations which were made on the adjacent property and the cracks and openings made the leased building unfit for the use for which it was leased. The rear portion had to be torn down and rebuilt. The lessee sued for cancellation of the lease and for damages. The court ordered the lease canceled'as of date of judicial demand and absolved the lessee from payment of rent from that date. The demand for damages was denied because the lessee did not vacate the premises as the court held that she had the right to do. The court, in the course of its opinion, said:
 

 “We say she had the right to cancel the lease, for the reason that the situation was not one calling for ‘repairs’ to the building, but for a ‘reconstruction’ of the same.”
 

 Under the authorities noted, and many more there are which might be cited to the same effect, it is very clear that, where the vices and defects are of such a nature as to render the building unfit for the use for which it was leased, and the lessee is forced
 
 *817
 
 to vacate the leased premises during the course of the repairs, he has the right to have the lease dissolved as of date the ejectment took place and to he relieved of the payment of future rent.
 

 But, drgue counsel for lessors, while article 1724 of the Code Napoleon did provide that, if the repairs are of such nature that they render uninhabitable what is necessary for the lodging of the tenant and his family, the tenant is entitled to the cancellation of his lease that any provision to meet such condition was omitted from the corresponding article 2700 of our Code, and that there is no law in this state which authorized the revocation of the lease where the leased building becomes so defective as to require the tenant to vacate while the building is being repaired or reconstructed.
 

 We think this contention is fully answered by the authorities cited.
 

 However, it may be said additionally that our article 2700 is much broader than article 1724, Code Napoleon, for it is provided in the last clause that, if the repairs have been of such a nature as to oblige the tenant to leave the house and to take another house while the one leased is undergoing repairs, the whole of the rent shall be remitted.
 

 This can mean nothing else than that the lease is at an end, for counsel would hardly contend that the lease would remain in force for its full term as against the lessors with the whole of the rent remitted.
 

 In the ease of Levy v. Madden, 116 La. 374, 40 So. 767, in considering article 2700 of our Code in connection with article 1724 of the Code Napoleon, this court said:
 

 “We cannot construe article 2700 so as to nullify the lessor’s guarantee as provided in article 2695. The articles can be harmonized by restricting the provisions of article 2700 to the ordinary and usual case where repairs become necessary and
 
 urgent by
 
 reason of accident, decay, or ordinary wear and tear.”
 

 And in the case of Henry Bose Mercantile Co., supra, the court said:
 

 “The only difference between the French law and ours on this point, if any, is the one already noticed, namely, that by article 1722 of the Code Napoleon the right of the lessee to revoke the lease in case of partial destruction of the thing leased is qualified; whereas, under our article 2697 it would appear to be unqualified, so that our law would appear to be more liberal to the lessee than the French law.”
 

 Now, according to the prevailing opinion in France, the lessor may put an end to the lease if the injury to the thing leased be so great as to necessitate reconstruction as contradistinguished from mere repairs.
 

 To which we may add that not only the jurisprudence of this state, but the textural provisions of the Code, gives to the lessee the right to put an end to the lease and to be absolved from the payment of the rent where the repairs are of such nature as to amount to reconstruction and the lessee is forced to vacate by reason of such reconstruction. -
 

 That the tearing down of the side wall of the building and the upper front wall and replacing bo'th with entirely new material is a reconstruction and not a mere repair ought to appear obvious even to an untrained judicial mind.
 

 The contention that the wall reconstructed was a party wall and that the lessors had the legal right to tear it down for the purpose of replacing the Phoenix building is not pertinent and is clearly without force.
 

 The wall stood on land wholly owned by the lessors; that is, two of the lessors owned the Phoenix building and a three-fourths interest in the lease building. No part of either building was owned by any person who could be legally said to occupy the relation of a third person to the lessors.
 

 The case is governed entirely by the law which determines the rights of the .lessee and fixes the obligations of the lessor, and the articles of the Code relating to servitudes and the rights of different owners of a wall
 
 *819
 
 in common have no application to the case.
 

 This brings us to a consideration of the question of damages.
 

 The trial judge, in his written reasons for dissolving the lease and allowing some damages, states that:
 

 “We think Mr. Delian is entitled to every cent of damages which have been proven in this case and which have not been brought about by his failure and positive refusal to minimize the damages.”
 

 We thoroughly agree with the learned judge that, under the circumstances of this case, the lessee is entitled to the fullest measure of reparation that is possible and that can be justified under the evidence and the law.
 

 The lessors acted in violation of the duties and warranties which they owed to their lessee and in utter disregard of his right to a peaceable and uninterrupted possession of the property. They invaded the premises over the protest of the lessee for the purpose of tearing down the walls and rebuilding them to satisfy their own purposes and to advance their own financial interest. To accomplish this end and to protect themselves against the interference of their lessee they invoked the strong arm of the law — the injunctive process of the court. When called on to repair the injury they had caused their lessee, they answer reproachfully that they had the legal right to tear down and rebuild the adjoining property owned by them, even though such act resulted in the interruption of the lease and the ejectment of their tenant. That the most which the lessee can claim is one month’s reduction of rent; but even this they offer as an act of grace on their part — a gratuitous concession as it were.
 

 And even more than this, they demanded that their lessee go back into the property and fulfill the terms of the lease, and, otherwise, that he be compelled to pay the full rental -,of the property for the unexpired term.
 

 They followed this' up by causing all of the lessee’s equipment in the premises to be seized and still hold the same in custodia legis.
 

 In assuming this position the lessors ignore the fact that they, and they alone, set in motion the cause which brought about the interruption of the lease and the dispossession of their tenant.
 

 Instead of refraining from committing any act that would be calculated to injure and impair the rights of the lessee they created the necessity for tearing down and rebuilding the wall.
 

 We need go no further than the plain articles of the Code to sustain the proposition that the lessors under such circumstances are answerable in damages for all injuries sustained by the lessee not avoidable by nor inconsistent with certain legal duties • imposed on such lessee.
 

 The first item of damage claimed is $700. In connection with this item it is ux-ged that, beginning with January 9th and extending up to February 28th, the lessors in demolishing the Phcenix building caused a great deal of noise, dust, axxd confusion about the restaurant.
 

 That they blocked entirely the pavement in front of the bxxilding'and forced all of his patrons to pass through a narrow, winding temporary passageway, subjecting said customers to physical danger and inconvenience, and that in consequence the patronage was very greatly reduced, which entailed a loss of xn'ofits to the extent stated.
 

 The district judge seems to have overlooked this item; at least we assume that the amount he allowed was for loss of profits for the time of the actual eviction. The interference and disturbance before actual eviction covered a x>eriod of say one month and two-thirds.
 

 There is no doubt that during this period
 
 *821
 
 the lessee suffered considerable loss of patronage which .greatly reduced his profits. On this item we think he is entitled to $300.
 

 The next item is $1,711.15 for immovable improvements, including labor and cost of material, made on the premises by the lessee at the beginning of the lease. The nature of these improvements and additions with the cost of each is fully established by the evidence.
 

 It is, true the lease contract provides that all the improvements and additions made by the lessee should at the end of the term fixed in the lease become the property of the lessors without cost to them. The conduct of the lessors, however, prevented the lessee from enjoying the advantage and benefit of these improvements which he was clearly entitled to for the full term of the lease. The lease was abrogated by the act of the lessors, and the lessee, after being ejected,-was not compelled to renew the lease, and his failure to do so does not debar his right to recover.
 

 The lessors cannot be permitted to, enrich themselves as the result of their own fault to the manifest injury and loss of their lessee.
 

 The lessors should be held to pay in proportion such part of said amount as the unexpired term of the lease bears to the whole term, or say forty-five sixtieths. This would amount to $1,282.95.
 

 Such a recovery, based on a like apportionment, was allowed in Knopp v. Guerin, 144 La. 765, 81 So. 302.
 

 The third item is for $7,000, being the value of the restaurant equipment which was provisionally seized at the instance of the lessors.
 

 The property has not been converted or placed beyond the reach of the lessee, but, as we have already noted, is still under seizure. We are unable to say from the evidence to what extent said property has been depreciated, nor to fix the loss sustaincd by the lessee. This item will have to be left open for future determination.
 

 The last item of damage is $18,400 for loss of profit for the unexpired term of the lease.
 

 We think this item was correctly disallowed by the court below.
 

 After the building was reconstructed and put in condition for occupancy, the lessors invited the lessee to go back under the lease; which the lessee declined to do. As we have said he had the legal right to refuse, but in exercising this right he thereby barred himself from recovering for profits which he claims he would have realized under the lease. In view of this offer of the lessors, even though they had actively breached the contract, as we have held,- we do not think that the lessee could fold his arms in idleness, refuse the opportunity to enjoy the benefits of the location under his lease, and to speculate on the anticipated damages from his lessors.
 

 The doctrine of minimizing damages resulting from a breach of contract is recognized by the civil law and is too well settled in the jurisprudence of this state to require citation of authorities.
 

 And this doctrine applies even where the damages sustained are the proximate and direct result of the breach of a contract.
 

 For the reasons assigned, it is ordered and decreed that the judgment which declared the lease abrogated and rejected the demand of the lessors and dissolved the writ of provisional seizure is affirmed.
 

 In other respects the said judgment is amended by increasing the same as against Mrs. Bettie Youree and Mrs. Bose Lloyd from $400 to $1,9S2.95, with legal interest thereon from May 24, 1924, till paid.
 

 The right of the lessee to sue for any damages sustained by reason of the provisional seizure is reserved to him. All costs to be paid by all of the lessors. . . .