110 So.2d 732

Herman BRUNIES

v.

**POLICE JURY OF PARISH OF JEFFER-
SON** and Board of Control of Jefferson
Parish Library.

No. 44145.

March 23, 1959.

John E. Fleury, Gretna, for plaintiff-appellant.

Philip B. Smith, Parish Attorney, Gretna, George C. Stringer, Jr., Asst. Parish Attorney, James O. Manning, Asst. Parish Atty., New Orleans, for defendant-appellee.

SIMON, Justice.

Plaintiff instituted this suit jointly against the Police Jury of the Parish of Jefferson as the governing authority of the Board of Control of the Jefferson Parish Library, and the Board of Control of the Jefferson Parish Library to recover the sum of $25,500, alleged to be the aggregate of rentals due under a written contract of lease which he executed on November 7, 1952, and alleged to have been breached by the defendant's abandonment of the leased

premises. The property leased is a certain building measuring 50 feet on Newton Street by 84 feet on Second Street, designated by No. 700 Second Street, Gretna, in the Parish of Jefferson, and which for more than forty years had been occupied and used as a restaurant, bar and oyster counter, save for a period of two months immediately preceding the execution of the lease. The building was leased for the purpose of a parish library and headquarters, and was for a term of eight years, beginning November 1, 1952, at a rental of $250 per month for the months of November and December, 1952, and January, 1953, and thereafter a monthly rental of $300. He further avers that said lease contained the following clause:

"The within leased premises and appurtenances, including the locks, keys, plumbing, and glass, elevator, and heating system, if any, and all other fixtures, are accepted by the Lessee in their present condition, except such repairs and improvements as are written into this lease, and except such as may be needed to the roof or rendered necessary by fire or other casualty."

Defendants answered denying any indebtedness to plaintiff. They averred that several days after the inception of the lease, its agent discovered that a supporting wall of the building was in an advanced stage of decomposition rendering it uninhabitable, dangerous to occupants, and unfit for the use and purposes intended without extensive reconstruction, all as evidenced by the notices of condemnation served on plaintiff by the city inspector and the State Fire Marshal. They further assert that plaintiff was duly notified that on his failure to make these repairs without delay the lease would be considered abrogated. It is further set forth that on April 17, 1953, plaintiff having failed to make the requested extensive repairs, defendants thereupon officially notified him of its withdrawal from and cancellation of the lease.

Following the filing of suit plaintiff died, and his daughter, Mrs. Mildred B. Uchello, as his sole heir and legatee, was substituted as party plaintiff.

The Police Jury has also been legally replaced by the Jefferson Parish Council, and these substituted parties are the proper representatives of this controversy.

A trial on the merits resulted in a judgment in favor of defendants, dismissing plaintiff's suit, and from which this appeal is prosecuted.

A stipulation of the existing facts was mutually agreed upon, the contents of which, stated narratively, are: Plaintiff, as owner of the then vacant premises, began negotiations in the early part of October, 1952, with the President of the Jefferson Parish Library Board of Control with a view of leasing to the latter the designated building to be used as a public library and

headquarters. After several conferences, a written lease was executed on November 7, 1952, effective November 1, 1952, for a term of eight years, at a stipulated rental of $250 per month for each of the months of November and December, 1952, and January, 1953, and $300 per month for each of the succeeding months of its stipulated duration. The first month's rent for November, 1952 was paid, and possession of the building was taken primarily for making such minor repairs and renovations and alterations as were suitable for a library. While making these repairs the matter of changing certain walls and alterations was suggested by the lessee and authority for so doing was granted by lessor. While in the process of these alterations, a partition wall built of 1″ x 12″ flat boat planks, separating the dining room and bar from the kitchen, the restaurant side of which was covered with mirrors extending across its entire width, and on the kitchen side of which was covered with galvanized sheeting and brick veneer, was discovered to be in a badly deteriorated condition. This partition wall, commonly termed "bearing wall", served as a structural support for the roof. The building inspector for the City of Gretna and the State Fire Marshal's office were immediately called upon to make an inspection of the building. These two agencies, after full inspection, condemned the building as not fit for public use without extensive repairs; that two bearing walls had to be de-

signed by a licensed architect or engineer and constructed in compliance with the city building code, and the plans of which had to be submitted and approved, all as shown by written notices of November 21 and 22, 1952. Following this condemnation, the Library Board on December 18, 1952, officially notified its lessor that it was relinquishing possession, no further rent payments would be made, and that unless the building was placed in a safe condition for public use according to the requirements aforestated, that the lease would be considered cancelled. Whereupon plaintiff employed an architect to draft and file plans and specifications. At a regular board meeting held on January 22, 1953, the lessor called the Board's attention to the clause, *supra*, contending that since the building was accepted in its "present condition" that the cost of such construction be absorbed by the lessee through an increase in rental payments. The Board thereupon submitted the proposal that the lessor submit the cost of the work required, that it be paid by him, he to be reimbursed by a rental increase until paid in full, all, however, subject to the approval of the district attorney. The cost involved was submitted on February 19, 1953, and following a discussion as to its legal responsibility under the contract, the Board thereupon called upon its legal advisor as to the legality of the lease. It appears. that the plans and specifications had

in the interval been approved by the City and State agencies.

On March 6, 1953, the lessor was notified that the Board had no authority to expend public funds in reconstruction of a privately owned building, and that if he failed or refused to make the necessary repairs it was entitled to consider the lease terminated. On March 12, 1953, the lessor proposed a compromise in that the cost and expense entailed be equally borne, and that after the completion of the work that a *"new lease contract"* be executed at the same rental and for the same term as provided in the original lease. On March 17, 1953, this proposal was rejected. Then followed a board meeting held on April 16, 1953, at which time the lease contract was officially declared cancelled, and on the following day formal notification thereof was served on lessor.

Plaintiff thereafter proceeded to not only make the repairs called for, but other extensive renovations and additions, all at a total expense of $7,070.61. On August 31, 1953, lessor notified the Board that his building was ready for occupancy, and he *"inquired of the Board about the leasing of said property for the library."* Whereupon the Board appointed a committee to negotiate for a lease of other premises. At a meeting on September 10, 1953, plaintiff again presented to the Board the question of "taking over the property", to which the Board informed him of its adherence to the

official action taken on April 16, 1953. He thereupon formally tendered the premises for occupancy with the offer that the Board be credited for the unpaid rentals covering the months from December 1, 1952, the date of its forced evacuation, to September 30, 1953, a period of ten months. This was rejected.

It is further stipulated that the vices and defects in the building were unknown to the lessor and lessee and only discovered as aforestated.

It is important to observe that the vices and defects were discovered within a few days after the lessee took possession of the premises on November 7, 1952, shortly followed by the lessee vacating the building as a result of its condemnation, and that the offer of the lessor to return the property to the lessee was made on September 10, 1953.

It cannot be disputed that the two bearing walls in their then totally defective condition interdicted public use and occupancy of the building, nor that these walls would have served as ample support and would have required neither reconstruction nor additional support during the entire term of the lease.

The primary question to be determined is whether or not the acts and conduct of the lessor under the circumstances related had the effect in law of dissolving and abrogating the lease and justified the lessee in considering the lease at an end.

Under the express provisions of the LSA–Civil Code, Article 2692:

"The lessor is bound from the very nature of the contract, and without any clause to that effect:

"1. To deliver the thing to the lessee.

"2. To maintain the thing in a condition such as to serve for the use for which it is hired.

"3. To cause the lessee to be in a peaceable possession of the thing during the continuance of the lease."

By Article 2693, LSA–Civil Code, it is the duty of the lessor to make all repairs to the leased premises that are necessary while the relation of landlord and tenant exists, except those enumerated in Article 2716 of the Civil Code, which devolve upon the lessee. Under the latter article the tenant is obliged to make no others. Where the lessor fails to make repairs devolving on him, it is discretionary with the lessee, but not obligatory upon him, for the lessee to make the repairs and deduct the cost from the rent. Landry v. Monteleone, 150 La. 546, 90 So. 919; White v. Juge, 176 La. 1045, 147 So. 72.

Article 2695 of the Code declares that the lessor guarantees the lessee against all vices and defects of the thing which may prevent its being used, this being true whether such vices and defects existed at the time of the lease or arose subsequently to it.

Article 2698 of our Code provides: "The lessor has not the right to make any alteration in the thing during the continuance of the lease."; and Article 2699 gives to the lessee the right to annul the lease, if the thing ceases to be fit for the purpose for which it is leased. Article 2700 of the Code provides that:

"If, during the continuance of the lease, the thing leased should be in want of repairs, and if those repairs can not be postponed until the expiration of the lease, the tenant must suffer such repairs to be made, whatever be the inconvenience he undergoes thereby, and though he be deprived either totally or in part of the use of the thing leased to him during the making of the repairs. But in case such repairs should continue for a longer time than one month, the price of the rent shall be lessened in proportion to the time during which the repairs have continued, and to the parts of the tenement for the use of which the lessee has thereby been deprived.

"And the whole of the rent shall be remitted, if the repairs have been of such nature as to oblige the tenant to leave the house or the room and to take another house, while that which he had leased was repairing."

██ It is contended by learned counsel for the lessor that the civil law does not authorize the lessee to treat the lease as abrogated because of necessary temporary disturbance or privation of possession due to the removal and rebuilding of two bearing walls. That Article 2692 of our Code which binds the lessor to maintain the thing leased and causes the lessee to be in peaceable possession is not authority for abrogation due to temporary disturbance; nor is Article 2695 of our Code, which makes the lessor guarantee the lessee against vices and defects which prevent the thing leased being used authorize cancellation, particularly when the vices and defects have been remedied by reconstruction and the premises tendered to the lessee for occupancy.

██ It is readily observed that these interrelated provisions of the Code, supra, governing contracts of lease refer only to repairs in general and not to reconstruction. But a consideration of these articles when construed together, with reference to their general spirit and intendment, the lessor, aside from the obligation of maintaining the leased property in a condition to serve the purpose for which it is leased, guarantees the lessee against all vices and defects of every kind and character which may defeat the use and occupancy of the property. The lessor is denied the right to alter or change the thing during the lease. If the premises become unfit for use, or fulfill the purpose for which it is leased, the lessee may consider it terminated and obtain its annulment. It is equally clear that if the nature of the repairs are such as to compel the lessee to vacate the premises, the whole of the rent will be remitted. Hence, it is manifest as a corollary that if the whole of the rent is remitted, the lease terminates.

Beginning with our earliest jurisprudence we have repeatedly observed that repairs and reconstructions are so interwoven that difficulty is often experienced in distinguishing the line of demarcation.

In the early case of Caffin v. Redon, 6 La.Ann. 487, the lessor sued his lessee for rent due. The lessee prayed for a dissolution of the lease on the ground that there were such inherent defects which rendered the building unfit for the use intended. The lessor admitted the need of repairs, but contended that the repairs had begun and that the building would soon be put in perfect condition, and that he would indemnify the lessee from any losses he might sustain; that under such circumstances the lessee had no right to have the lease dissolved. The question presented was whether the changes made were repairs or reconstructions. Though the building had been condemned, all alterations made were in full compliance with the orders of the city officials.

The court therein observed that though these changes had been made and the building had become free of defects, such a fact

did not impair the lessee's rights, and it held that:

> "The taking out of the brick pillars and wooden lintels, and replacing them with granite, was, in legal intendment, a re-construction, and not a repair of that part of the building. The inherent defect which made that re-construction necessary entitles the defendant to a dissolution of the lease."

In the case of Henry Rose Mercantile Co. v. Smith, 139 La. 217, 227, 71 So. 487, 490, the court in the course of its opinion said:

> "If the premises have ceased to be fit for the use for which they were leased, and the work of restoration amounts to reconstruction and not to mere repairs, the lessee is entitled to revoke the lease."

In Reynolds v. Egan, 123 La. 294, 48 So. 940, 947, where the rear wall had to be torn down and rebuilt because of the unfitness for use the court said:

> "We say she had the right to cancel the lease, for the reason that the situation was not one calling for 'repairs' to the building, but for a 'reconstruction' of the same." Also see King v. Grant, 43 La.Ann. 817, 9 So. 642.

In Dehan v. Youree, 161 La. 806, 109 So. 498, 501, the damage to the building was so extensive that the building inspector for the city ordered the premises vacated until it could be placed in a safe condition. The work of restoring the wall lasted about one month. When the work was completed the lessor notified the lessee the premises were ready for occupancy. The lessee declined to retake possession contending that the lessor by his unwarranted acts had put an end to the contract. This court held that:

> " * * * where the vices and defects are of such a nature as to render the building unfit for the use for which it was leased, and the lessee is forced to vacate the leased premises during the course of the repairs, he has the right to have the lease dissolved as of the date the ejectment took place and to be relieved of the payment of future rent." Also see Zibilich v. Rouseo, 166 La. 547, 117 So. 586.

All of the cases decided under the related articles of our Code involve the right of the lessee to terminate and have the lease revoked because of the untenantable condition of the leased premises or more strongly, where the building has been condemned by governing authorities, forcing an evacuation of the lessee. It must be conceded that in some cases the court, in determining whether the discovered vices and defects involved mere repairs or structural reconstruction, drew a distinction between property that requires mere repairs, making it feasible for the lessee to continue his occupancy though with some inconvenience (in which instances the court refused to ter-

minate the lease, the right of dissolution not being based on the degree of inconvenience), and those cases where the leased premises, because of newly discovered vices and defects forcing evacuation through condemnation and requiring structural reconstruction, as contradistinguished from mere repairs, (in which instances the court terminated the contracts.)

■ Under the stipulated facts here presented, and under our jurisprudence and the textural provisions of the Code, we readily recognize and give effect to the right of the lessee to terminate the lease and to be absolved from the payment of any rentals. The vices and defects were, in the instance cause, of such a nature as to constitute reconstruction. The fact, standing alone, that the property, shortly following lessee's entry of possession, had been officially condemned by the city building inspector and the office of the State Fire Marshal as untenantable and an ominous source of danger to public use, makes it obvious even to the untrained judicial mind, that the magnitude of the required work was structural reconstruction and not mere. repairs. Treigle Sash Factory v. Saladino, 211 La. 945, 31 So.2d 172.

We are not impressed with plaintiff's contention that the lessee, having "accepted" the leased premises "in their present condition, except such repairs and improvements as are written into this lease, and except such as may be needed to the roof or rendered necessary by fire or other casualty", has no right to consider or demand the cancellation of the lease.

■ We recognize that the parties to a lease have the right, as have the parties to a sale, to broaden or restrict their respective rights and obligations flowing therefrom. This clause, supra, is not exceptional but is rather commonplace in contracts of lease. We do not think the parties to this contract have contemplated, by this clause, that the lessee should have assumed the risk and consequences of vices and defects in the premises so radical as to warrant and justify its condemnation—a vice of such magnitude as to be utterly destructive of the intents and purposes of the lease and carrying with it, as a direct consequence, the dissolution of the lease.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment dismissing plaintiff's suit at his cost is affirmed.

HAWTHORNE, J., absent on account of illness, takes no part.