232 So.2d 103 (1970)
Robert B. REED et al., Plaintiffs-Appellants,
v.
CLASSIFIED PARKING SYSTEM et al., Defendants-Appellants.
No. 11341.
Court of Appeal of Louisiana, Second Circuit.
February 3, 1970.
Rehearing Denied March 3, 1970.
Writ Refused May 4, 1970.
*104 Hargrove, Guyton, Van Hook & Ramey, by James A. Van Hook, and Billy R. Pesnell, Shreveport, for plaintiffs-appellants.
Blanchard, Walker, O'Quinn & Roberts by Neilson S. Jacobs, Shreveport, for defendant-third-party plaintiff-appellant.
Wiener, Weiss & Wiener, by Jacques L. Wiener, Jr., Shreveport, for third-party defendants-appellees.
Before AYRES, BOLIN and PRICE, JJ.
BOLIN, Judge.
Plaintiffs, Robert B. Reed, Rutledge H. Deas, Jr., and Shreve-Park, Inc., bring this action to cancel their sublease with defendant, Classified Parking System, affecting The Auto Hotel, a multistoried parking garage at 520 Edwards Street in Shreveport, Louisiana. Defendant answered in the nature of a general denial and filed a third-party demand against Mr. and Mrs. John B. Hutchinson, original lessors and owners of the premises, asking for cancellation in the event plaintiffs are entitled to such relief in the main demand. The Hutchinsons answered with a general denial and by way of a reconventional demand against Classified and a third-party demand against plaintiffs, demand reimbursement for the cost of repairing the roof and replacing the main electrical panel of the premises and judgment directing Classified and plaintiffs to place the man-lift system in an operable condition and to so maintain it during the term of the lease. Numerous exceptions were filed by all the parties and referred to the merits. The trial court rendered judgment overruling all the exceptions of no cause and right of action filed by plaintiffs and Classified; rejected the principal demand and third-party demand for cancellation; rejected demands of the Hutchinsons for reimbursement for the roofing and electrical work; granted the Hutchinsons' demands against Classified and plaintiffs, in solido, ordering them to install an operable man-lift system in the premises within ninety days and, in the alternative, a money judgment in the amount of $5,373, the cost of a new man-lift installed; and granted a like award to Classified and against plaintiffs as to the man-lift. From that judgment plaintiffs and defendant Classified have appealed, and the Hutchinsons have answered the appeal seeking a reversal insofar as their demands as to the roofing and electrical work were rejected. The exceptions have been abandoned and are not before this court on appeal.
*105 The stipulation of facts in the record show that the Hutchinsons operated The Auto Hotel from the date of its construction in 1930 until 1956. By instrument dated May 15, 1956, the Hutchinsons leased the premises to Classified Parking System, a Texas corporation, for the purpose of operating an automobile parking and storage garage. By instrument dated December 1, 1958, Classified subleased the premises to the plaintiffs for the same purpose.
The man-lift, presently located in the leased premises, was installed when the building was constructed in 1930, although parts have been replaced from time to time. The man-lift was in use from that time until December of 1964, when it became inoperable. The man-lift has become completely inoperative and cannot be used. A workable man-lift is required for the operation of a first-class automobile parking and storage garage as contemplated by the lease and sublease. Almost all of the component parts of the man-lift, except the electric motor, would have to be replaced to put the man-lift in working condition, including some of the lead shields which are sunk into the various concrete floors and which are designed to hold the iron bolts fastening the frame support braces.
The roof of the leased premises leaked prior to the date of the lease to Classified in 1956. The roof continued to leak and was leaking at the time of the sublease in 1958. However, plaintiffs had no notice of the leaking condition at the time the sublease was executed. While the roof presented no particular problem at first, the situation became progressively worse and finally became acute shortly before January of 1963. In September of 1963, the Hutchinsons had a hot-mix asphalt topping placed on the roof parking area which improved the situation temporarily. The asphalt began cracking within two weeks from the completion of the job, and the leakage of water has grown progressively worse. About a month after completion, water was still dripping down to the seventh floor, and is now leaking down to the fifth floor. At the same time the Hutchinsons had a new electrical panel installed in the premises. The panel then in use was installed when the building was erected, and had become damaged as a result of the water leaking into the electrical system. The installation of the new electrical panel restored some of the electric lights on the various floors; however, at the present time there are no lights at all on the seventh floor. In addition, shorts occur in the various electrical circuits from time to time causing the circuit breakers to cut off the electricity on the circuits affected. In many instances the electric light fixtures have rusted and corroded as a result of the leaking water and cannot be used.
Because of the leakage, many parked automobiles have been damaged which plaintiffs were obligated to repair. The details surrounding the damage to these automobiles will be noted later in this opinion.
As we view the record there are three issues on appeal:
1. Is the man-lift worn out or only in need of extensive repairs, and, if the former, on whom does the obligation of replacement fall?
2. Does the work which is necessary to maintain an adequate roof on the building constitute ordinary repairs, structural repairs or reconstruction, and, if the second, on whom does the obligation fall?
3. If either or both of the above obligations fall to the Hutchinsons, is the building so untenantable that it cannot be used for that which it was intended, thereby entitling the lessee and sub-lessees to cancellation of the lease and sublease, respectively?
Responsibility for the man-lift rests on the interpretation of Articles 12 and 14 of the lease (sublease). Article 12 of the lease (sublease) provides:
"This lease covers not only the real property described herein but also all *106 equipment and fixtures (but specifically excluded are the inventories) now in the premises and used by the sub-lessors in connection with the operation of the parking business. Sub-lessee agrees that all similar equipment and any other equipment in use in the business at the time of the termination of this lease, as well as all fixtures and improvements added to or made by the sub-lessee during the term, shall become the property of the sub-lessors without further compensation."
Article 14 of the lease (sublease) provides:
"Sub-lessee shall operate and maintain, during the entire term of this lease, a first-class parking and storage garage on the demised premises and it shall maintain on said leased premises adequate equipment and personnel to render first-class service at all times. It shall conduct its automobile storage business on such premises in a manner designated to produce the maximum gross storage revenue therefrom. Sub-lessee agrees, as part of the consideration of this lease, that it obligates itself not to divert any storage business from the leased premises so long as there is available in the leased premises a vacant car stall or space."
Under the above lease provisions it is the duty of the sub-lessee (lessee) to make the necessary repairs to all equipment used in the leased premises, including the man-lift. However, for this court to hold that the word maintain includes the obligation to replace worn out equipment would be to give the lease clauses a broader interpretation than was intended by the parties. The lease states that the sub-lessor (lessor) shall own all fixtures and improvements without compensation upon termination of the lease, but we are unable to find any language to the effect the sub-lessee (lessee) must replace worn out equipment as a result of reasonable wear and tear during the term of the lease.
Upon careful study of the record we find the preponderance of both expert and lay testimony establishes the man-lift was worn out in 1964, when it was retired from operation. The apparatus had been in operation since 1930, almost fifteen years beyond its expected life span.
Therefore, plaintiffs' liability only arises if they were negligent in their care and maintenance of the man-lift during the term of the lease. The trial judge in his reasons for judgment held the plaintiffs were negligent in caring for the man-lift from 1961 to 1964 due to the inexperience of Mr. Humphries, an employee of the plaintiff. We cannot agree with these conclusions. Plaintiff attempted to contract three companies for performance of routine maintenance. It is obvious by their refusal they felt the man-lift was beyond any condition to be repaired, needed to be replaced, and they could not stand behind any work on the apparatus. Such a conclusion is substantiated by the cancellation of insurance coverage in 1963. Only when these attempts failed did plaintiffs allow Mr. Humphries to perform the necessary maintenance and repairs as they were needed. On these facts, we conclude the plaintiffs were not negligent in the manner in which they cared for the man-lift. The obligation was on the Hutchinsons and not on the sub-lessees to furnish new equipment to the premises. Indeed, the parties stipulated a workable man-lift was essential to the operation of a first-class parking garage.
The resolution of the issue concerning the condition of the roof of the building hinges upon the proper interpretation and application of Article 5 of the sublease (and lease) which provides:
"* * * The sub-lessee (lessee) accepts the demised premises in the condition in which they now are, and agrees to keep them at a good state of repair during the term of this lease, a reasonable wear and tear excepted. It is specifically agreed that the sub-lessors (lessors) *107 shall not be liable or responsible for any repairs whatsoever."
Whether clauses of this nature obligate the sub-lessees to make ordinary repairs, extraordinary repairs, or structural repairs is immaterial to the facts of this case as such clauses are not so broad as to encompass structural defects. Fazzio v. Riverside Realty Company, 232 La. 794, 95 So.2d 315 (1957). Although the sub-lessee accepts the demised premises in the condition in which they now are, he is still entitled to the warranty protection afforded him by Articles 2692 and 2695 of the Louisiana Civil Code. Brunies v. Police Jury of Parish of Jefferson, 237 La. 227, 110 So.2d 732 (1959); Knapp v. Guerin, 144 La. 754, 81 So. 302 (1919); Bennett v. Southern Scrap Material Co., 121 La. 204, 46 So. 211 (1908); Pierce v. Hedden, 105 La. 294, 29 So. 734 (1901).
The roof of the parking garage, as it was originally constructed in 1930, is known technically as a rib-slab type of roof. The roof consists of a series of concret joists and an inner deck of homogenous concrete cast monolithically with the joists. The concrete inner deck is overlaid with a waterproof tar composition membrane, several inches thick. Over this membrane is the outer wearing surface consisting of a two and one-half inch layer of concrete poured in sections which are separated by expansion joints filled with tar to allow for expansion and contraction of the concrete. This outer wearing layer is the exposed parking surface.
Since the waterproofing membrane cannot be seen or inspected without removing the concrete outer wearing surface, its condition at a given time can only be inferred from the surrounding circumstances. At the trial, witnesses who testified as experts on the roof were of the opinion even with the best of care and maintenance, in time it would be necessary to replace the waterproofing membrane. The membrane could not be expected to last more than thirty years, and difficulties could be expected after fifteen years.
Therefore, it was incumbent upon the Hutchinsons under their implied warranty to replace the waterproofing membrane in the roof and thereby correct the structural defect. Notwithstanding the temporary repairs in 1963, which were unsuccessful in that they provided relief for only a short time, the Hutchinsons have done nothing to correct the situation resulting in great damage to the premises.
In light of the above facts, plaintiffs, sub-lessees, have two courses of action available to them. Article 2694 of the Louisiana Civil Code provides:
"If the lessor do not make the necessary repairs in the manner required in the preceding article, the lessee may call on him to make them. If he refuse or neglect to make them, the lessee may himself cause them to be made, and deduct the price from the rent due, on proving that the repairs were indispensable, and that the price which he has paid was just and reasonable."
However, while they have the privilege or option under Article 2694 to perform repairs which are the responsibility of the lessors, that is not the exclusive remedy available. Boutte v. New Orleans Terminal Co., 139 La. 945, 72 So. 513 (1916); Landry v. Monteleone, 150 La. 546, 90 So. 919 (1922). The lessee, sub-lessees in this case, may sue for cancellation of the lease. Article 2729 of the Louisiana Civil Code provides:
"The neglect of the lessor or lessee to fulfill his engagements, may also give cause for a dissolution of the lease, in the manner expressed concerning contracts in general, except that the judge can not order any delay of the dissolution."
In order to justify a cancellation of the lease, the lessee must show the lessor has failed or refused to comply with his obligations for which he contracted in the lease. This plaintiffs have affirmatively proved. In addition, the lessee must prove *108 that he has been seriously disturbed in his possession or that the premises no longer serve for the use for which they were leased. See LSA-C.C. Art. 2692: Young v. Eddy, 86 So.2d 243 (La.App. 1 Cir.1956); Lacour v. Myer, 98 So.2d 308 (La.App. 1 Cir.1957); LaNasa v. Winkler, 144 So.2d 489 (La.App. 4 Cir.1962).
The record in this case shows by 1962 the defect in the roof began to manifest itself. Chunks of concrete began to spall and fall from the ceilings of the premises in the area around the steel reinforcing bars embedded in the concrete joists. Following a rain, water began to drip down from the ceilings inside the premises onto cars parked in the garage, carrying along an alkaline substance which could not be washed off. The cars had to be cleaned with a compound, washed and polished. Drippage onto a windshield had to be removed before it dried or permanent damage resulted. Failures in the electrical system occurred, leaving the building without lighting in certain areas. The falling chunks of concrete create hazards to life and property.
On the basis of the above facts, proved by a preponderance of the evidence, we conclude the sublessees were subjected to much more than mere inconvenience and are entitled to a dissolution of the sublease. In a like manner, Classified Parking System, sub-lessor, is entitled to a cancellation of its original lease with the Hutchinsons, original lessors.
For the reasons assigned the judgment is annulled and set aside and it is now ordered, adjudged and decreed that the judgment read as follows:
It is hereby ordered, adjudged and decreed that all exceptions filed on behalf of plaintiffs, Robert B. Reed, Rutledge H. Deas, Jr., and Shreve-Park, Inc., and on behalf of defendant, Classified Parking System, be and they are hereby overruled.
It is further ordered, adjudged and decreed that there be judgment in favor of petitioners, Robert B. Reed, Rutledge H. Deas, Jr., and Shreve-Park, Inc., and against defendant, Classified Parking System, cancelling the aforesaid sublease from defendant to Robert B. Reed and Rutledge H. Deas, Jr., dated December 1, 1958, pertaining to the following described premises, to-wit:
520 Edwards StreetNorth 78 feet of Lots 6, 7 and 8, Block 32, of the City of Shreveport, Caddo Parish, Louisiana, together with buildings and improvements thereon,
and decreeing the same to be of no further force and effect.
It is further ordered, adjudged and decreed that there be judgment in favor of defendant, Classified Parking System, and against John B. Hutchinson and Bessie Lee Hutchinson cancelling the lease dated May 15, 1956, pertaining to the following described premises, to-wit:
520 Edwards StreetNorth 78 Feet of Lots 6, 7 and 8, Block 32, of the City of Shreveport, Caddo Parish, Louisiana, together with buildings and improvements thereon,
and decreeing the same to be of no further force and effect.
It is further ordered, adjudged and decreed that the reconventional demand against Classified Parking System by John B. Hutchinson and Bessie Lee Hutchinson for reimbursement of the Lachle Electric Company bill of $198.93 in connection with installing a new electrical panel in the premises, and for reimbursement of the Industrial Roofing and Sheet Metal Works bill of $3,734.00 in connection with roofing work, be and they are hereby rejected; and likewise the third-party demands of John B. Hutchinson and Bessie Lee Hutchinson against plaintiffs, Robert B. Reed, Rutledge H. Deas, Jr., and Shreve-Park, Inc., for reimbursement of the said Lachle Electric Company and Industrial Roofing and Sheet Metal Works bills be and they are hereby rejected.
*109 It is further ordered, adjudged and decreed that the reconventional demand of John B. Hutchinson and Bessie Lee Hutchinson against Classified Parking System, and their third-party demand against Robert B. Reed, Rutledge H. Deas, Jr., and Shreve-Park, Inc., ordering defendant and plaintiffs to have a man-lift in operation in the premises, be and they are hereby rejected.
It is further ordered, adjudged and decreed that the third-party demand of Classified Parking System against Robert B. Reed, Rutledge H. Deas, Jr., and Shreve-Park, Inc., ordering plaintiffs to have a man-lift in operation in the premises, be and it is hereby rejected.
It is further ordered, adjudged and decreed that all costs of these proceedings be taxed to and paid by John B. Hutchinson and Bessie Lee Hutchinson.
Reversed and rendered.