WICKER, Judge.
This appeal arises from a suit filed on behalf of Marie D. Bostick (Bostick), plaintiff/appellee, against Glenn D. Wood (Wood) and GW Contractors, Inc. (GW) as successors in interest to Point Landing, Inc., defendants/appellants. Bostick sought to collect damages as a result of Wood’s and GW’s cancellation of a lease. Wood and GW leased batture property from Bostick for a barge fleeting operation. Wood and GW rely on a lease provision for cancellation due to governmental interference; Bostick asserts she was not given the opportunity to correct any condition triggering termination. The trial judge ruled in favor of Bostick and awarded her $110,000.00. Wood and GW have appealed. We reverse.
These parties entered into a lease agreement March 1, 1978. That agreement was for five years with two five-year options for renewal. These renewal options were exercised and the lease expired February 28, 1993. GW by letters dated October 13, 1982 and November 26, 1982 exercised its option to renew the first and second five-year periods. The purpose of the lease is stated in the lease agreement as follows:
Lessee desires to lease certain premises owned by Lessor fronting on the Mississippi River in the Parish of Jefferson for the purpose of mooring, fleeting and making up tows of barges along with towboats and floating equipment[.]
By letter dated March 22, 1988 Wood was informed by the U.S. Army Corps, of Engineers (Corps) that revetment construction would begin. That letter stated in part:
*298 It is not possible to give you a definite schedule for the revetment construction but placement of concrete mattress on the Mississippi River is tentatively scheduled to commence about September 1, 1988. A firmer schedule will be available about July 15, 1988.
That letter also informed Wood that the Corps would interfere with his use of the premises as follows:
Our work in the vicinity of your barge mooring facilities may require modifications to these facilities. The concrete mattress will be placed as close to your anchor piles as practicable. Stone will be placed on those areas where complete coverage of the underwater slope cannot be accomplished with the concrete mattress. It will be necessary for your buoys within our construction limits to be free of vessels for two non-eonsecu-tive periods of 1 to 2 days each during which construction will take place. Resumption of barge fleeting activities after completion of revetment construction will be allowed provided the mooring systems prevent the barges from contacting the revetted bank at all river stages. In the event that a new mooring system is required, submission of a standard navigation permit application, channeled through the appropriate agencies will be necessary.
The lease provides lessee the option to terminate the lease on the following ground:
If ... any governmental agency interferes with the Lessee’s use of the premises as contemplated by this Lease Agreement, then Lessee may, at its option, terminate the Lease Agreement or any part thereof and receive a prorata refund of any rental payment hereunder.
It was stipulated that the first notification by Wood to Bostick that he intended to cancel the lease was by letter dated July 25, 1988. At trial Wood admitted he had not used the batture for fleeting operations for approximately 18 months prior to the revetment and did not foresee using it in the future due to the poor economy. The trial judge evidently concluded there had been no governmental interference with Wood’s fleeting operation since he was not using the property.
On appeal, the appellants raised several specifications of error. These include the alleged error that the trial judge failed to acknowledge the right to cancel and that it applied an erroneous duty on the part of appellants to give Bostick the opportunity to comply with the new requirements.
Gerard J. Brantley, a U.S. Corps, of Engineers Chief of the Channel Stabilization section for Engineering, identified a letter written by the Corps’ Chief of Construction dated July 27, 1988. That letter was introduced into evidence. It was written to GW and outlines the revetment construction. It states in part:
Reference your July 25, 1988 phone conversation with Mr. Roth of my office concerning construction of Luling Revetment. The work consists of extending the revetment 7,100 linear feet downstream in the vicinity of river mile 116 on the right descending bank. Clearing and grubbing began on July 17, 1988 and was completed July 22, 1988 and is scheduled to be completed on July 29, 1988. Articulated Concrete Mattress (ACM) is scheduled to be placed between August 17 and 23, 1988. Placement of stone on the upper portions of the bank will be done within two months after ACM placement is complete.
Timothy J. Roth, a Corps’ employee, testified he was familiar with the revetment of the batture property at issue. After the March, 1988 letter was sent to Wood he received a call in late July from Wood. Wood never requested of him what the Corps’ requirements would be for him to continue his barge fleeting operation. Pri- or to July 25, 1988 Jim Ducote, a Corps’ field representative, met with Wood. Du-cote obtained permission from Wood to disconnect a buoy and pull it on the bank.
Roth stated that once the revetment was done GW had to apply for a permit and conform with one of the following provisions required by the Corps and outlined in a memorandum dated August 5, 1985 and introduced into evidence:
*299 c. Modification to Permitted Mooring Systems for Revetment Construction.
(1) Mooring systems using dolphins or anchor piles with buoys will not require any major alterations for revetment construction. Suspension of the mooring and fleeting operation will be required during revetment construction.
(2) Mooring systems using land ties that secure the moored barges against the bank will require major modifications. The mooring and fleeting activity will be suspended during revetment construction. Upon completion of revetment work mooring and fleeting operations can be resumed provided the permit holder obtains an approved permit for a mooring system which will prevent the moored barges from resting against the articulated concrete mattress at all river stages. The acceptable alternate designs for this type system in order of preference are:
(a) Mooring dolphins.
(b) Anchor piles with mooring buoys.
(c) Continuation of the land tie system with the government changing the standard revetment design. The design change would consist of placing a heavy layer of stone along the upper bank in lieu of concrete mattress and allow barges to breast against the stone. This would be contingent upon the permit holder contributing funds to the government to cover the additional cost of constructing revetment as described above.
Wood testified that he installed deadmen at the beginning of the Bostick lease for mooring purposes. After the revetment construction by the Corps he was unable to pay the cost for the new requirements.
Wood stated he exercised his option to cancel the lease in July, 1988. He had not been fleeting barges approximately 18 months prior to July, 1988 because he had no customers. In 1988 he did not get an estimate of the cost to modify his barge fleeting operation because he already knew the cost. He admitted he did not know whether Bostick was consulted about the removal of the buoy. He decided to have the buoy removed because he would have to risk spending thousands of dollars to reattach it. His former customer had put the buoy in for his use. The buoy was a large one for mooring “very large ocean vessels.” Since he no longer had that customer he no longer had a use for the buoy.
Wood explained how the Corps interfered with his operation as follows:
I had deadmen on the bank, up on the batture itself in the dirt, we had anchor piles in the ground with chains coming out and barge cables coming out that would attach a barge that would be laying against the raw batture. Once they revetted it, this system of mooring barges against the bank was no longer acceptable.
* * * * * *
My intention, initially, with the Bosticks was to use their property in a conventional barge mooring system. Once I had a different set of rules that I had to go by as far as putting in a more expensive facility, I couldn’t afford to do that. That’s why I had it in my lease that I could get out if the government interfered. And that, specifically, was what it was designed at, a revetment.
People in my — I’m—I’m a barge fleetor. We don’t have the funds and capital to put in dolphins and mooring systems that are required to operate off of revetments.
Wood stated Bostick knew about the revetment in July and had approximately two months before the work was completed by the Corps to remedy the situation.
Although appellee argues Bostick was not given the opportunity to modify the batture in compliance with the Corps’ requirements the record is devoid of any testimony or evidence that Bostick would have been willing to incur the necessary costs to have Wood’s fleeting operation continue in service.
Bostick testified her husband wrote the lease. She stated that when she received the July, 1988 letter from Wood informing her of the revetment she contacted the Corps. She stated Roth told her the revet *300 ment would not interfere with the mooring or fleeting of barges. She further testified Roth did not discuss with her that there would have to be a new application for a permit.
Roger Swindler, a Corps’ employee, testified he processes permits. He stated once the revetment was done then section C described above in the memorandum and entitled “Modification to Permitted Mooring Systems for Revetment Construction” applied. After the revetment was completed GW could not have used the batture for mooring without having a structure to keep the barges off the bank.
Durwood Dunn, an expert Marine Engineer, testified he prepared a cost analysis for modifying the batture. The cost would be $270,500.00.
The trial judge gave no reasons for judgment. However, he was evidently concerned about GW’s lack of use of the bat-ture for 18 months prior to the revetment. He questioned Wood regarding the damages he suffered as a result of the revetment. Wood testified the economy was poor and for the two months during which the Corps revetted the batture he had no lost revenue. He also stated he could not afford to restructure the batture in compliance with obtaining a permit. It is undisputed that a permit for operation would now have to be granted by the Corps and that restructuring the batture would be necessary to comply with the new requirements.
The appellee also argued below that Wood and GW had no right to unilaterally cancel the lease without affording Bostick reasonable opportunity to cure the disturbance. In support of this position she relies on La.Civ.Code Arts. 2013 et seq. These articles apply to dissolving a contract for failure to perform. They are in-apposite. The lease agreement between these parties gives GW and Wood an absolute right to cancel the lease “If ... any governmental agency interferes with the Lessee’s use of the premises ...” The Louisiana Supreme Court has recognized that parties have the right “to broaden or restrict their respective rights and obligations” under a lease. Brunies v. Police Jury of Parish of Jefferson, 237 La. 227, 110 So.2d 732 at 738 (La.1959).
A similar option to cancel a lease due to governmental interference of the use of the river and its banks was noted in Texas & P.Ry. Co. v. Mengel Co., 62 F.Supp. 752 (E.D.La.1945). In Mengel the court held that right was absolute and explained at 756:
Where, as here, the absolute right of cancellation exists under certain conditions, the party enjoying that right, as does the defendant in this case, cannot be required to expend money in order to avoid the necessity of cancellation when those conditions are present. Indeed, it would be a contradiction in terms to grant an absolute right under certain conditions and then, when those conditions arose, to compel the party possessing the right to pay toll in order to avoid the necessity of exercising it. [emphasis in original].
Similarly, it would be a contradiction to grant the absolute right and then to compel Wood and GW to afford Bostick the opportunity to correct it. There is no provision in the lease requiring Wood or GW to afford Bostick the opportunity to correct.
Furthermore, we have followed Tassin v. Slidell Mini Storage, Inc., 396 So.2d 1261 (La.1981) by holding:
Where there is a conflict between the general law of lease and the terms of the contract, the contract should prevail unless the rights of others are affected or the result would be contrary to the public good. The codal articles regulate the relationship between lessor and lessee when the lease is silent.
Pace v. Loyal Order of Moose, Lodge 2195, 538 So.2d 299, 304 (La.App. 5th Cir.1989).
We are aware of no express or implied prohibition in the law against the option in the instant lease. There is also no showing the provision is against public good or policy. Furthermore, the option in the lease only affects or addresses the rights of the lessor and lessee. See General Leasing Co. v. Leda Towing Co., Inc., 286 So.2d *301 802, 805 (La.App. 4th Cir.1973), writ denied, 290 So.2d 334 (La.1974).
Appellee also relies on the case of Mennella v. Kurt E. Schon E.A.I., LTD., 979 F.2d 357 (5th Cir.1992). That decision discusses Louisiana law relative to dissolving a contract for failure to perform. That case is inapplicable since the circumstances are different herein. Wood and GW did not terminate the lease due to Bostick’s failure to perform but were instead exercising an option agreed upon in the lease agreement.'
We are aware that governmental interference occurred at an opportune time for Wood and GW in that the company had not had a customer for 18 months prior to the interference. However, the Louisiana Supreme Court has held in Dean v. Beck, 46 La.Ann. 1168, 15 So. 357 at 359 (1894):
It is claimed that the real motive of the plaintiffs in asking a dissolution of the lease is to be found in the failure of their business venture, independently of the building. That may be, but, if the circumstances of the case justified an abandonment of the premises, their motives in exercising the legal right do not affect the situation, [emphasis added].
See also Henry Rose Mercantile & Mfg. Co. v. Smith, 139 La. 217, 71 So. 487, 490 (1916).
Although Beck and Smith concerned dissolution rather than the exercise of an option to terminate we conclude the principle stated above applies herein as well. Wood and GW exercised a legal right under the lease to terminate; although the time to do so was opportune the company had the right, regardless of motive, to terminate.
Accordingly, for the reasons stated, the judgment in favor of plaintiff, Marie D. Bostick, and against defendants, Glenn D. Wood and GW Contractors, Inc. in the amount of $110,000, together with legal interest thereon from the date of judicial demand, plus court costs, is reversed. Judgment is now rendered in favor of the defendants, Glenn D. Wood and GW Contractors, Inc. against plaintiff, Marie D. Bostick, dismissing Marie D. Bostick’s suit with prejudice. Costs are taxed against plaintiff, Marie D. Bostick.
REVERSED AND RENDERED.