WICKER, Judge.
The Loyal Order of Moose, Metairie Lodge #2195 (MOOSE LODGE), and its insurer, Fireman’s Fund Insurance Compa *300 ny, appeal a judgment finding them liable for damages to Charles Pace. The issue is proof of causation of a fire. We affirm.
Pace owned a decades-old building at 801 Jefferson Highway which he leased to the Moose Lodge in 1979. On the day of the fire, October 16, 1983, the Moose Lodge was being used for a social affair, with some members of the Lodge in attendance and supervising the affair. Twenty minutes after these members left the building, witnesses saw smoke coming from the building. The fire heavily damaged the building, making it difficult to pin-point the exact cause or origin of the fire; but the area of heaviest damage appeared to be the electrical switch box.
Pace sued the Moose Lodge for damages, alleging failure “to maintain the electrical, heating and cooling systems of the premises in good working order pursuant to the provisions of its lease agreement....” Fireman’s Fund reconvened against Pace, alleging similar acts of negligence and failure to maintain. The trial judge awarded judgment to Pace in the amount of $212,-250.00 against the Moose Lodge and Fireman’s Fund; and he dismissed the recon-ventional demand. He reasoned:
A lessee can only be liable for the destruction occasioned by fire, when it is proved that the same has happened either by his own fault and neglect, or by that of his household. LA.C.CIV.PRO. ART. 2723 [sic]. The fire broke out shortly after a function of the Moose Lodge had ended. The Court finds it more probable than not that the conduct of the Moose caused the fire.
The Moose Lodge complains of the judge’s inference that, because the fire was discovered shortly after a social affair, the fire was due to the fault or neglect of the Moose Lodge, and of the judge’s conclusion that Pace had met his burden of proving the cause of the fire.
The two-day trial produced several witnesses for each side, and we summarize their testimony.
THE TESTIMONY: Pace’s Witnesses
GEORGE A. HERO, an expert electrical engineer. He was connected with Comfort Air Company, Fox Engineering, and George A. Hero Company; and he investigated fire losses and explosions. He examined the remains of the building twice in connection with making his report. He found extremely heavy damage. The electrical service was quite old, with trees, vines, and stuff growing up around it. He found evidence of numerous additions, and disconnect switches were added through the years. Some of the wiring probably dated from the 30’s, 40’s and 50’s; and some of it was new wiring.
It was difficult to determine the origin of the fire, but the deepest burn was in front of the closet containing the lighting panel [the switch room]. There was also heavy damage on the nearby bar. The burn behind the bar was on the back wall. He believed the fire started on the first floor and spread upward to the second floor. He had no precise determination as to the cause of the fire, and he could not exclude cigarettes as the source. Both of the badly burned areas were in the rear of the main room on the first floor. The main electrical service was on the upper level. The electrical closet or switch room mainly had wiring and an electrical board. It may have taken 15 or 20 minutes after the fire started to see smoke outside.
His final conclusion as to cause: “the age of the wiring and the evidence of revisions that the electrical system was the most probable origin because of the extent of the damage determining the point of origin was not easy.”
MEL CARACCI. She lived catty-corner from the building with a clear view of it. She was sitting out on her porch and saw Howe and Spier leave alone 20 or 30 minutes before she saw the smoke. The building was there at least 16 years, but she didn’t think it was there in the 30’s. She didn’t know when it was built.
EVELYN VOTELSINGER, Caracci’s sister. She had a clear view. She didn’t know who was the last to leave, but she saw smoke about 20 to 25 minutes after the last people left. The smoke looked like it was coming from part of the eave. She *301 didn’t know how long the building was there, but she did remember when it was called Luke and Jerry and operated like a casino.
CHARLES PACE, the plaintiff and owner/lessor of the building. He was self-employed in the music box business and was semi-retired. He bought the building in 1965 for $60,000.00. The two-story stucco building of 9,000 to 10,000 feet was always a lounge as far as he knew. He had leased it out since he had it. He didn’t know how old the building was when he bought it. At one time it was a casino and then a restaurant called the Golden Peacock. He never had the wiring redone or replaced. He acquired the equipment he claimed was lost in his reconventional demand from a prior lessee in lieu of rent. He visited the premises several times to take care of roof leaks but he never got around to fixing the cracks in the wall. The building was in good repair, and no tenants ever complained. The Moose Lodge only complained about roof leaks. He may have offered to sell the building to the Moose Lodge for $125,000.00, but he can’t remember. The building was insured for $22,-000.00, and he spent $8,000.00 clearing the remains away. Two months before the fire, he got a policy [quotation] valuing the property at $241,000.00; but the premium was so high he couldn't afford it.
BETH INBAU, an expert fire investigator. She was employed by the Jefferson Parish Department of Inspection Code Enforcement. She investigated the fire and made a report.
A. [T]he magnitude or [sic] destruction was go [sic] great we could not gain access to approximately seventy-five percent of the building. So the few areas that we could go we could see where the fire traveled through but could not determine whether that was the origin of the fire or whether the pathways that we were seeing were done after the fire and had started in after or before the ceiling had collapsed.
[[Image here]]
A. It is impossible to tell [the path of the fire] since almost the entire second floor was destroyed and collapsed on the ground level. I could see a path from .what they call the “switch room”_ In that room there was heavy fire damage which would lead us to believe that the fire did start there but because I could not examine the rest of the building, I could not rule out other causes.
[[Image here]]
A. No conclusions could be drawn due to the severity and unsafe condition of the building and not being able to examine everything. In other words, I could not rule out other possibilities about the initial origin as to the cause of the fire so I could not make any conclusions as to the origin or cause of the fire.
Q. So it would be your testimony that in your investigation that the fire might have originated in an ash tray or it might have originated in the switch room or it might have originated in a garbage can or it might have originated in an appliance, it is uncertain?
A. Undetermined, yes sir.
PETER CANNIZZARO, expert appraiser. He did an appraisal four years after the fire on information given by Pace and from tax bills and other insurance information. He valued the 9,790 square foot building at $21.50 per square foot for the building alone on a cost approach. Using a market approach, he valued the building and land at $301,000.00. He saw no photographs of the building. He only estimated the condition of the building based on normal wear and tear over the sixteen years of Pace’s ownership.
Moose Lodge’s Witnesses
CHARLES HOWE, a member and officer of the Moose Lodge. Before his retirement, Howe was in charge of safety for ODECO. The lease began in 1978, and the Lodge used the building for meetings and social functions. The first two months were rent free, in exchange for cleaning up the building. The building had been in existence since at least 1949. Pace never asked the Moose Lodge to obtain insurance on his belongings. Pace did not have the building rewired, and the wiring looked normal. The switch room had several fuse *302 boxes, switches, and wires. The Lodge added on a line or circuit. All cooking was done on a commercial stove on the second floor, and the kitchen was just used for warming with roaster ovens or crockpots. There were no built-in appliances. The Lodge used existing outlets. No one ever checked to determine if the outlets could accommodate the appliances; but they never blew a fuse, so -he assumed the outlets were sufficient for their purposes. About 30 days prior to the fire, the building passed a fire department inspection.
The afternoon of the fire, the Lodge had been donated to the Jazz Club for a jam session. The band used a microphone with two speakers, plugged into outlets. Between 75 and 90 people were in attendance, with six or seven Moose Lodge officers. The officers generally supervised these functions, and he was supervising that afternoon since he had set it up. The jam session was from one to five p.m., and nothing noteworthy happened. The Lodge served sandwiches and beer, wine, and whiskey. There was one old beverage cooler with deteriorated insulation under the bar. They also used a beer box, cooler, a crock pot, and maybe an oven roaster the afternoon of the jam session.
He left the building about 7 p.m. the evening of the fire, and he was the one who closed up. He checked that the doors were locked, that the lights were out, and made sure everything in the kitchen was out. All the appliances were already unplugged. He flipped out all the switches in the switch room. (There were few or no wall switches, and almost everything was controlled from the switch room.) He saw or smelled no smoke except for cigarettes. No one cleaned up or took out the trash, since that was generally done on Monday, the following day, by people hired to clean up. About thirty minutes or less after he left, he got a call that the building was on fire.
CHARLES H. SPIER, a member and officer of the Moose Lodge. The building was in poor condition, with constant leaking and a bad odor; and the restrooms were terrible. The Lodge had to go through an inspection and obtain licenses. It had no problem with the electrical system prior to the fire.
The Lodge used the building for meetings and social gatherings and had a Jazz Club social the afternoon of the fire. He arrived about 1 p.m., and the function began about 2. He tended bar and helped around the place. There were about 75 to 100 people in attendance, about twenty Moose and the rest Jazz Club. The officers of the Lodge supervised. Some of the members’ wives did the cooking. There was a little room set up with hot plates, oven, and stove to heat food. The stove was in one corner, the oven in the other, with hot plates on the counter. The Lodge served nachos, hot dogs and chili, and alcoholic beverages. The function lasted until about 6 p.m.
He made sure everything was all right and the doors locked before leaving. He was sure his wife turned off the oven, stove, and hot plate; but he didn’t check or see Howe check. They did not take out the trash or empty the ash trays. They also didn’t clean up since someone was coming in the morning to clean. It would be correct to say the last guest left around 7 p.m. There were no flames or odor of smoke when he left.
About one hour after leaving, he got a call at home about the fire. When he got there, smoke was coming out of the stairwell to the right. This was not where the function was. No one was allowed on the second floor at the function; this was the Lodge meeting room.
MARK J. JOSEPH HART. He was a claims adjuster for Fireman’s Fund and hired someone to investigate the cause of the fire. He adjusted the claim and paid the Moose Lodge $64,105.51 for its losses. Pace was not on the policy as a loss payee.
JULIUS NUEMEYER, a member and officer of the Moose Lodge. He was responsible for paying the bills and maintaining the records for the Lodge. The building dated back to at least 1948. He made a yearly inventory of the Lodge property, and he denied, that Pace had much of the equipment he claimed was lost in the fire. *303 He never notified Pace of any problems with the electrical system and didn’t recall any. The Lodge may have replaced a switch and several wall sockets.
The day of the fire, there were about 100 to 125 people in attendance, of which forty to forty-five were Lodge members. The band used a microphone but no amplifiers. The officers provided supervision, but there was no one with specific instructions to be the overseer. The Lodge served hot dogs and used the stove and not hot plates. He left about 6:30 or 6:45 p.m., and there were six to eight people still in the building when he left.
OSCAR ERNST, a member and officer of the Moose Lodge. He was in the used furniture business and estimated the value of Pace’s furnishings, excluding air conditioners and other mechanical equipment, at $250.00.
THE LEASE:
Several lease provisions are relevant to the issue of responsibility for the premises and for damages:
The within leased premises and appurtenances, including the locks, keys, plumbing, and glass, elevator, and heating system, if any, and all other fixtures, are accepted by the Lessee in their present condition, except for such repairs and improvements as are written into this lease, and except such as may be needed to the roof or rendered necessary by fire or other casualty. The Lessee agrees to keep them in the same order as received, during the term of this lease....
... Lessee shall maintain liability insurance to the extent of $1,000,000.00 and plate glass insurance as an additional safeguard; and $25,000.00 fire insurance on contents.
[[Image here]]
Lessee is obligated not to make any additions or alterations whatever to the premises without written permission ...
[[Image here]]
Lessee assumes responsibility for the condition of the premises and Lessor will not be responsible for damage caused by leaks in the roof, by bursting of pipes by freezing or otherwise, or by any vices or defects of the leased property, or the consequences thereof, except in the case of positive neglect or failure to take action toward the remedying of such defects within reasonable time after having received written notice from Lessee of such defects and the damage caused thereby. Should lessee fail to promptly so notify Lessor, in writing of any such defects, Lessee will become responsible for any damage resulting to Lessor or other parties, (emphasis added).
[[Image here]]
Lessor shall have responsibility of repairing roof of leased premises and carrying his own liability insurance.
We believe that the provisions of this lease contemplate that even if the fire resulted from defective wiring the Moose Lodge might be responsible. There is testimony that, if the wiring was old and inadequate, nevertheless the Moose Lodge never called any such defects to Pace’s attention. Furthermore, the Moose Lodge accepted the condition of the premises at the beginning of the lease; and there has been no evidence that any action by Pace caused any further deterioration of the electrical or any other system in the building.
In addition to the positive law of the lease contract, there are Louisiana Civil Code articles which regulate the relationship of lessor and lessee, some of which conflict with the lease contract.
The duration and the conditions of leases are generally regulated by contract, or by mutual consent. Art. 2684.
The lessor is bound from the very nature of the contract, and without any clause to that effect: ... 2. To maintain the thing in a condition such as to serve for the use for which it is hired. Art. 2692. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; *304 and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same. Art. 2695.
The lessee is bound: 1. To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease_ Art. 2710. The lessee is bound to cause all necessary repairs to be made which it is incumbent on lessees to make, unless the contrary hath been stipulated. Art. 2715.
The repairs, which must be made at the expense of the tenant, are those which, during the lease, it becomes necessary to make: To the hearth, to the back of chimneys and chimney casing. To the plastering of the lower part of interior walls. To the pavement of rooms, when it is but partially broken, but not when it is in a state of decay. For replacing window glass, when broken accidentally, but not when broken either in whole or in their greatest part by a hail storm or by any other inevitable accident. To windows, shutters, partitions, shop windows, locks and hinges, and everything of that kind, according to the custom of the place. Art. 2716.
The expenses of the repairs, which unforeseen events or decay may render necessary, must be supported by the lessor, though such repairs be of the nature of those which are usually done by the lessee. Art. 2717.
The lessee is only liable for the injuries and losses sustained through his own fault. Art. 2721.
He can only be liable for the destruction occasioned by fire, when it is proved that the same has happened either by his own fault or neglect, or by that of his family. Art. 2723. [Cited by the trial judge in his reasons for judgment as La.C.Civ.P. art. 2723.]
Where there is conflict between the general law of lease and the terms of the contract, the contract should prevail unless the rights of others are affected or the result would be contrary to the public good. The codal articles regulate the relationship between lessor and lessee when the lease is silent. Tassin v. Slidell Mini Storage, Inc., 396 So.2d 1261 (La.1981). See La.C.C. art. 2715.
A plaintiff generally has the burden of proving his allegations. The Moose Lodge argues that Pace has failed to meet this burden, that he has presented only circumstantial evidence which does not exclude other just-as-reasonable hypotheses about the cause and origin of the fire, and that Pace should not be allowed to shift the burden of proof to the Lodge using the theory of res ipsa loquitur. Pace argues that the application of the doctrine of res ipsa loquitur is appropriate and that ample circumstantial evidence establishes the negligence of the Moose Lodge.
The Supreme Court has considered the requirements to prove liability for fire in Boudreaux v. American Insurance Company, 264 So.2d 621 (1972). The plaintiffs, children of a man who lived in an adjacent building and died in the fire, sued the insurer of the owner and operator of the restaurant where the fire originated. The evidence showed that the last employee on the premises of the restaurant carefully checked to be sure that all kitchen fires and pilots were turned off before he left for the evening; the grease from the deep fryer had been poured out and stored in a metal container; the duct work, hood, grease filters, and vent were newly installed six weeks prior to the fire; the filters were cleaned weekly; the ducts had not been cleaned since the installation; and the appliances were cleaned the evening before the fire. The fire alarm was turned in less than an hour after the last employee left. The experts were not able to establish the cause of the fire, but one speculated that somehow a flame from the kitchen passed through the filters and into the duct work, igniting the accummulated grease. The experts did agree that the fire started in the kitchen. The trial court dismissed plaintiffs suit, the Fourth Circuit affirmed, and the Supreme Court granted writs.
After initially ruling that the plaintiffs had failed to prove causation and affirming, the Supreme Court reversed in rehear *305 ing, believing that “the trial and intermediate court decisions erroneously exacted of the plaintiffs a heavier burden of proof than is required by law.” At 634.
Recently, in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155 (1971), we summarized the several judicial formulations of this burden of proof in civil cases and concluded:
“In describing this burden of proof, the courts sometimes speak of proof to a ‘reasonable certainty’ or to a ‘legal certainty’; or of proof by evidence which is of ‘greater weight’ or ‘more convincing’ than that offered to the contrary; or (in the case of circumstantial evidence) of proof which excludes other reasonable hypotheses than the defendant’s tort with ‘a fair amount of certainty’. Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not.”
Further, as we specifically held in Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963), by this burden of proof, the circumstantial evidence requisite in civil negligence cases need not negate all other possible causes of injury, as the opinions of the previous courts seemed to hold. It suffices if the circumstantial proof excludes other reasonable hypotheses only with a fair amount of certainty, so that it be more probable than not that the harm was caused by the tortious conduct of the defendant. 153 So.2d at 396-397.
In this respect, the principle of “res ipsa loquitur” (the thing speaks for itself) sometimes comes into play as a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury in the absence of other as-plausible explanation by witnesses found credible.... Thus, by this principle where properly applied, the circumstantial evidence indicates that the injury was caused by some negligence on the part of the defendant, without necessarily proving just what negligent act caused the injury.
We noted in Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389, 391 (1957): “* * * the maxim [res ipsa loquitur] means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference ... The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence ... When all the evidence is in, the question is still whether the preponderance is with the plaintiff.”
Nevertheless, when all the evidence is in and the question is whether, by reason of the res ipsa loquitur rule, the plaintiff has preponderantly proved that the defendant is responsible in tort for his injury, we have in our most recent decision on the issue noted that the real test of applying res ipsa loquitur to be as follows: “Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the most plausible explanation of the accident?” Pilie v. National Food Stores, 245 La. 276, 158 So.2d 162, 165 (1963). (Italics ours.) On the- other hand, application of the principle is defeated if “an inference that the accident was due to a cause other than defendant’s negligence could be drawn as reasonably as one that it was due to his negligence.” 158 So.2d at 165 (Italics ours.)_ This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probably than not, his injury was caused by the negligence of the defendant.
Applying these principles to the present controversy, the evidence as a whole shows that the defendant’s insured’s negligence was the most plausible or likely cause of the fire which *306 caused the decedent’s death. At 635-37 (emphasis by the court; footnote and some citations omitted).
This opinion is generally cited at length in subsequent cases dealing with liability for fire, including those cases involving the respective responsibility of lessors and lessees. Recently, it was again cited by the Fourth Circuit in Maryland Cas. Co. v. Saunders, 394 So.2d 1256 (La.App.1981). In that case involving a restaurant, the lessor’s insurers sued the lessee and his insurer; and the appellate court reversed a judgment in favor of the lessee, agreeing that the trial judge had failed to apply the doctrine of res ipsa loquitur. The court concluded that
the specific negligent act need not be proven where circumstantial evidence indicates that the injury was caused by some negligence on the part of the defendant.
As between the lessor and the lessee and their respective insurers, the lessor had no active control in the renovation or operation of the business. The defendant was in exclusive control of the agency responsible for the injury and is in a much better position to explain the cause of the injury than the lessor.
At 1259 (emphasis by the court).
In other fire cases where the defendant prevailed, there were generally other reasonable inferences present to explain the origin of the fire. For example, in Barber v. Books, Etc., Inc., 316 So.2d 154 (La.App. 4th Cir.1975), writ den. 320 So.2d 559 (La.1975), there was evidence that children had been seen playing nearby and could have started the fire. In Carriere v. Olivier, 432 So.2d 1089 (La.App. 3rd Cir.1983), writ den. 438 So.2d 570 (La.1983), there was a gap of several hours between the departure of the defendant from the premises and the discovery of the fire, and there was evidence that someone other than the defendant had been seen smoking while seated in an overstaffed chair [the origin of the fire was in or around this chair]. Here, only the Moose Lodge and its Jazz Club guests had access to the premises, the Lodge had complete control over the premises, under the lease agreement it was responsible for maintaining the electrical system, it made modifications to the electrical system apparently without the knowledge or consent of Pace, and it used on the premises electrical cooking and/or warming appliances.
The trial judge saw and heard all the witnesses and concluded that “it is more probable than not that the conduct of the Moose cause the fire.” We cannot say he was clearly wrong in this determination, and we affirm his judgment. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The Loyal Order of Moose, Metairie Lodge # 2195, and Fireman’s Fund Insurance Company must pay the costs of this appeal.
AFFIRMED