liSULLIVAN, Judge.
This suit concerns a claim for damages resulting from the breach of an exclusivity contract. The trial court determined that defendant-appellee, Earl Lewing — d/b/a Take Ten Club, breached an agreement with plaintiff-appellant, Louisiana Gaming Corporation (LGC), which granted LGC the exclusive right to place video poker machines in defendant’s establishment. Instead of placing LGC’s machines in the Take Ten Club, defendant contracted with Reliable Amusement Company, an LGC competitor, to provide the machines. The trial judge awarded LGC $6,259.03 |2which represented the lost net profits of LGC for the period from mid-August, 1992 through January 4, 1993. LGC appeals and assigns as error the inadequacy of damages awarded. LGC seeks an increase in the award for profits lost from January 4, 1993 through April 18, 1994, the date upon which Reliable’s machines were removed from the Take Ten Club.
For the following reasons, we conclude that LGC is entitled to the additional damages as prayed for on appeal. Therefore, we amend the judgment to reflect an increase in damages to $40,478.97 plus interest from the date of judicial demand until paid.
FACTS
The facts of this case are fully set forth in our prior opinion, Louisiana Gaming Corporation v. Jerry’s Package Store, Inc., 629 So.2d 479 (La.App. 3 Cir.1993), rendered on December 8, 1993, wherein this court re *483 versed the trial court’s denial of plaintiffs motion for a preliminary injunction. We shall summarize the facts contained in that opinion and those facts pertinent to this case which occurred after the opinion was rendered.
On September 28, 1991, defendant entered into a written contract with Harold Rosbot-tom, Sr. d/b/a Automatic Amusement Company (AAC) through his agent, John Vaughn. The contract granted AAC the exclusive right to place video poker machines in the Take Ten Club. The contract was made conditional upon the promulgation of video poker regulations by the Louisiana State Police and legislative approval thereof along with AAC and the Take Ten Club becoming licensed to operate video poker machines under said regulations. The contract had an initial term of thirty-six (36) months to begin on the date AAC placed its first video poker machine in the Take Ten Club. The term “date a machine was first placed” was ^further defined in the contract as either ninety (90) days after the machines became legal or within fifteen (15) days of the Take Ten Club becoming licensed, whichever occurred later.
The Take Ten Club became a licensed video poker establishment on July 6, 1992. When Rosbottom received notice of the licen-sure, he contacted Lewing, who informed Rosbottom that he would not allow AAC machines in the Take Ten Club. Lewing also told Rosbottom that, in his view, AAC breached the agreement by not installing the machines in January, 1992. Additionally, Lewing said that he had obtained the three machines from a third party (Reliable).
Rosbottom d/b/a AAC then filed suit seeking a preliminary injunction to restrain Lew-ing d/b/a Take Ten Club from allowing a third party to place video poker machines in the Take Ten Club. The trial court, without oral or written reasons, denied plaintiff a preliminary injunction on January 4, 1993.
Rosbottom d/b/a AAC then devolutively appealed from the denial of the preliminary injunction. On August 6, 1993, Rosbottom d/b/a AAC filed a first supplemental petition in the trial court proceeding. Therein, plaintiff prayed for “an award of monetary damages ... including, but not limited to, a claim for lost profits.”
On December 8, 1993, this court reversed the trial court’s denial of a preliminary injunction and ordered that a preliminary injunction should issue to enjoin Lewing d/b/a Take Ten Club from permitting any person or entity to place video poker devices in the Take Ten Club. The issuance of the preliminary injunction was made conditional upon AAC giving bond with good security to be set by the trial court. We remanded the matter to the trial court for the fixing of the preliminary injunction bond pursuant to La.C.C.P. art. 3610. The record reveals that, before the trial on damages, the trial court held no such hearing and set no bond for AAC.
UOn December 30, 1993, Rosbottom d/b/a AAC assigned its rights under the aforementioned contract to LGC. On May 18, 1994, the trial judge signed an order substituting LGC for Rosbottom d/b/a AAC as the proper party plaintiff.
Trial of this matter was held on May 23, 1994. At the outset, the parties stipulated that, in light of the third circuit opinion granting a preliminary injunction, a permanent injunction should issue. The purpose of the trial was limited by stipulation to the amount of damages due to LGC from Lewing d/b/a Take Ten Club for the latter’s breach of contract.
Rosbottom testified that AAC is a sole proprietorship which he owns. Additionally, he owns 50% of the stock of LGC. He stated that LGC purchased three video poker machines for placement in the defendant’s club. He further stated that the costs associated with this enterprise include: (1) a $1,000.00 per machine per year state licensing fee; (2) $75.00 per month per establishment maintenance fee; and (3) a phone line service charge from the facility to the state’s computer in Baton Rouge.
Tim Wrinkle, a Certified Public Accountant, testified that he has prepared LGC’s tax returns each year since 1991. He corroborated Rosbottom’s testimony concerning the fixed costs associated with video poker, and he added that the telephone line charge is $49.50 per month per establishment. Wrin *484 kle further explained that the yearly licensing fee is split between the machine distributor and the establishment. In other words, for three machines, each party pays $1,500.00 in licensing fees per year.
Bobby Presson, a Reliable employee, also testified at trial. He stated that Reliable installed three video poker machines in the Take Ten Club in August, 1992. The machines were removed on April 18, 1994 and were operational during the [5entirety of the twenty-one (21) month period. The contract provided for an equal split of net revenues after payout to the players and payment of the State of Louisiana’s 22.5% tax. According to Presson, Reliable and Lewing also split equally the $1,000.00 per machine per year licensing fee. In conjunction with his testimony, LGC entered into evidence a spreadsheet detailing the financial activity of Reliable’s three machines. The spreadsheet reflects the following for the period from August 17, 1992 to April 18, 1994:
Cash In $281,766.75
Cash Out (To Players) 163,783.25
Net Cash In $117,983.50
Allocation:
State’s Share $26,546.22
Location’s Share (Take Ten) 45,718.81
Operator’s Share (Reliable) 45,718.46
The trial judge rendered written reasons for judgment on July 29, 1994. Pursuant to this ruling, she awarded LGC $6,259.03, the lost profit for the period from mid-August, 1992 through January 4, 1993. The trial court reasoned as follows:
The Court notes that plaintiff took a devolutive, not a suspensive appeal from the judgment rendered January 4, 1993. A devolutive appeal, by it’s (sic) definition, does not suspend the effect of the execution of an appealable order or judgment. Mr. Lewing relied on the ruling of the district court in the conduct of his business. Mr. Lewing is not liable for lost revenues suffered by Louisiana Gaming Corporation from the date of judgment by the District Court through the date the judgment was overturned on appeal. Mr. Lewing is, therefore, liable for the loss of revenues through January 4, 1993.
[[Image here]]
In addition, the Court notes that a preliminary injunction has prohibited Mr. Lewing from operating the machines of any other entity since the ruling from the _[6pourt of Appeal. Therefore, this court finds, that future damages are not appropriate.
Thereafter, on August 9, 1994, the trial court signed judgment in accordance with these written reasons. This appeal ensued.
OPINION
LGC contends on appeal that the trial judge erred in basing her denial of post-January 4, 1993 lost profits on the fact that LGC failed to take a suspensive appeal from the judgment rendered that date which denied LGC a preliminary injunction. For the following reasons, we agree with LGC’s position.
Our research indicates that, insofar as the measure of damages is concerned, this is a case of first impression. At issue is whether a defendant who relies upon a trial court’s denial of plaintiffs plea for a preliminary injunction (which is later reversed) is liable for damages which accrue after the date the trial court denied the preliminary injunction.
An appeal from the granting or denial of an injunction is governed by La.C.C.P. art. 3612 which provides, in pertinent part:
An appeal may be taken as a matter of right from an order or judgment relating to a preliminary or final injunction, but such an order or judgment shall not be suspended during the pendency of an appeal unless the court in its discretion so orders.
The jurisprudence pertaining to this statute recognizes a distinction between an appeal from the granting of a preliminary injunction and an appeal from the denial of a preliminary injunction. In the former case, an appeal can be either devolutive or suspensive,[1] *485 dependent upon the discretion of the trial court. However, an appeal from the denial of a preliminary injunction can only be devol-utive in nature because |7such an order or judgment necessarily contains no ruling which is subject to being suspended.
In this regard, the case of Waggoner v. Grant Parish Police Jtiry, 4 So.2d 833, 198 La. 798 (1941) is, insofar as its procedural ruling is concerned, directly on point. Therein, the Supreme Court of Louisiana reasoned as follows:
In this case a preliminary writ of injunction was refused upon a hearing by an interlocutory order or decree. Therefore, according to the plain language of the act, relators were entitled to a devolutive, but not a suspensive, appeal from the order.
The relief primarily sought by plaintiffs, relators here, was an order or judgment granting a preliminary writ of injunction prohibiting the defendants, respondents here, from enforcing or attempting to enforce the provisions of the police jury ordinance making it unlawful to sell intoxicating liquors in Grant Parish. Clearly a devolutive appeal from an order refusing the preliminary writs of injunction prayed for would not prevent the officers from proceeding, on and after the effective day of the ordinance, to enforce the provisions of the ordinance. But it is suggested that relators were protected by the suspen-sive appeal. The answer is that, under the law, they were not entitled to a suspen-sive appeal from the order refusing the preliminary writ of injunction and dismissing the rule nisi. And, even if rela-tors intended to take, and the judge intended to grant, a suspensive appeal from that order, such appeal would have no effect tmder the law. A district judge cannot confer upon a litigant a right which the law specifically withholds.
[H]e (the trial judge) announced from the bench that plaintiffs’ application for a preliminary writ of injunction was refused and that the rule nisi was dismissed. This was an interlocutory order or decree, from ivhich a devolutive, but not a suspensive, appeal could be granted. (Emphasis ours.)
Id, at 4 So.2d 836, 198 La. at 807-809. See also Brock v. Police Jury of Rapides Parish, 4 So.2d 829, 198 La. 787 (1941).
Clearly, LGC had no right to take a suspensive appeal. Therefore, the trial court’s reliance upon its failure to do so as constituting a bar to the recovery of Isdamages occurring thereafter was erroneous. Furthermore, the trial court’s conclusion, that Lewing’s reliance upon the trial court’s erroneous denial of the preliminary injunction necessarily absolves Lewing of liability for damages accruing thereafter, is likewise erroneous. The judgment relied upon by Lewing was rendered on January 4, 1993 and reversed by this court on December 8, 1993. In reversing, we specifically held that the trial court erred in denying the preliminary injunction and ordered that an injunction should issue conditional upon the trial court’s setting of bond for LGC. The trial court thereafter set no bond for LGC, and Lewing continued to operate Reliable’s machines in his Take Ten Club until April 18, 1994, over four months later. This fact was undisputed at trial. The trial court, however, denied LGC damages which accrued after December 8,1993 because it determined that Lewing was enjoined from operating Reliable’s machines pursuant to this court’s ruling. In other words, the trial court concluded that, by implication, Reliable’s machines were not operating after December 8, 1993. This conclusion is factually wrong. In our opinion, Lewing’s reliance upon a trial court judgment, which was later reversed on appeal, does not insulate him from damages accruing thereafter.
Since we have the complete record before us for our consideration, we shall assess the damages due to LGC which are reasonable in this case. La.C.C. art. 1995 provides “[djamages are measured by the loss sustained by the obligee and the profit of which he has been deprived.” In general, a claimant can seek injunctive relief or damages. However, in Slavant v. Calhoun Motor Speedway, 626 So.2d 771, 774 (La.App. 2 Cir.1993), the second circuit explained as follows:
The jurisprudence has established the principle that in the discretion of the court *486 compensatory damages may be awarded in lieu of injunctive relief. Freestate Industrial Development Co. v. T. & H., Inc., 188 So.2d 746 (La.App. 2d Cir.1966); Moreland v. Acadian Mobile Homes Park, Inc., 313 So.2d 877 (La.App. 2d Cir.1975), writs denied 319 So.2d 442, 443 (La.1975).
[[Image here]]
However, parties seeking an injunction may be entitled to monetary damages for past acts, as well as injunctive relief to prevent future acts. See 42 Am.Jur.2d Injunctions § 305 (1969); 43A C.J.S. Injunctions § 238 (1978). See also McGee v. Yazoo & M.V.R. Co., 206 La. 121, 19 So.2d 21 (1944); Borgnemouth Realty Co. v. Gulf Soap Corporation, 212 La. 57, 31 So.2d 488, 491 (1947); Critney v. Goodyear Tire & Rubber Company, 353 So.2d 341 (La. App. 1st Cir.1977).
McGee and Borgnemouth Realty Co., cited above, involved suits for the abatement of industrial factory nuisances. In that class of cases, the court concluded that the plaintiffs were entitled to have the nuisance abated through injunctive relief and for such damages suffered up to the time of the abatement. While the ease sub judice does not involve industrial nuisance abatement, it is factually similar to these cases because it involves continuous quantifiable damages (loss profits) which are “clearly subject to be measured and established, and recovery could be granted ... in dollars and cents.” McGee, at 19 So.2d 23. In fact, damages in this case are easier to determine than in the industrial nuisance abatement cases because the damages sought involve solely lost profits, i.e., a precise percentage of the net revenues taken in by the Reliable video poker machines. The total amount thereof is not in dispute.
It is clear to this court that LGC is entitled to lost profits, at the very least, from mid-August, 1992 until December 8,1993, the date upon which this court ruled that the preliminary injunction should issue conditioned upon LGC giving bond with good security to be set by the trial court after remand. No such bond was ever set by the trial court upon remand and the record does not indicate why it failed to do so. Since this court’s prior order that a preliminary injunction should issue was made conditional upon the trial court’s setting of LGC’s bond, we conclude that the | ^preliminary injunction did not in fact issue because the bond condition was not satisfied.
It is undisputed that, after this court’s prior order, Lewing allowed Reliable to continue operating machines in his Take Ten Club until April 18,1994. Technically speaking, Lewing’s action did not violate our prior decree because LGC’s bond was not set by the trial court, and thus, Lewing was not enjoined during this period from operating his Take Ten Club with Reliable’s video poker machines therein. At trial, the parties stipulated that the Reliable machines were removed on April 18, 1994 and that Lewing d/b/a Take Ten was thereafter permanently enjoined from placing third party video poker machines in the Take Ten Club.
We hold that LGC is entitled to lost profits from mid-August, 1992 through April 18, 1994, the total time period during which this exclusive rights contract was breached. We further conclude that the measure of damages due to LGC are its profits lost, i.e., the amount of money LGC would have made if its machines were in place instead of Reliable’s machines during the twenty-one (21) month period. Using Reliable’s share of net revenues, $45,718.47, as a starting point, we calculate the lost profits as follows:
LGC’s share of net revenues $45,718.47
Less:
LGC’s licensing fee (21 months) $2,625.00 LGC’s phone charge ($49.50/mo.) 1,039.50 LGC’s maintenance ($75.00/mo.) 1,575.00
Total Expenses 5,239.50
LGC’s lost profits $40,478.97
The amounts used in the above calculation were uncontradicted at trial and were taken from the spreadsheet and aforementioned testimony.
_[nDE CREE
For the foregoing reasons, the judgment of the trial court is amended to reflect an increase in the award in favor of plaintiff, *487 Louisiana Gaming Corporation and against defendant, Earl Lewing d/b/a Take Ten Club from $6,259.03 to $40,478.97 together with legal interest from the date of judicial demand for damages, August 6, 1993, until paid. All costs of these proceedings are assessed to defendant, Earl Lewing d/b/a Take Ten Club.
AFFIRMED AS AMENDED.

. A devolutive appeal does not suspend the effect or the execution of an appealable order or judgment. La.C.C.P. art. 2087. A suspensive appeal suspends the effect or the execution of an appeal-able order or judgment. La.C.C.P. art. 2123.