I,CARAWAY, J.
In this breach of a contract/lease action, Clay Brooks Jordan (“Jordan”) complains of the trial court’s ruling awarding Head’s Video Poker Company, Inc. (“HVP”) damages in the amount of $201,926.58 together with interest, attorney’s fees and costs. HVP answered the appeal requesting that the judgment be modified to hold Clay Brooks Jordan, Inc. (“Jordan, Inc.”) solidarity liable with Jordan. Finding no error in the trial court’s judgment or calculation of damages, we affirm the trial court’s ruling and decline to find solidary liability between Jordan and Jordan, Inc.

Facts

In early 1994, Marvin Head (“Head”), president of HVP, and Jordan had discussions regarding the placement of HVP’s video poker machines in Jordan’s business, the Kettle Restaurant in West Monroe (“Kettle”). On the strength of these negotiations, HVP paid to have a booth constructed at the Kettle to house the video poker machines and to have telephone lines installed necessary for the operation *948 of the machines. On April 7, 1994, Jordan and HVP signed a “Machine and Space Lease.” The agreement provided that the rental would be a division of the net proceeds from the gaming machines with 60% to Jordan and 40% to HVP.
At the time of the April 7 lease, neither Jordan nor HVP had obtained the necessary state licenses and permits required to own and operate video gaming devices. Jordan testified at trial that he agreed to sign the written lease merely to speed up HVP’s application for an owner/operator license. The April 7 lease stated a term for the lease, as follows:
“The Lessor hereby gives the Lessee the exclusive right for 3 years to install and maintain said equipment on the Lessor’s premises, if appropriate.”
l2On May 5, 1994, Jordan received a video gaming license for the Kettle but HVP still did not have the necessary license to place the gaming devices in the Kettle. On May 12, 1994, Jordan telephoned Head, surreptitiously recording the conversation, and informed Head that if HVP did not receive its license permitting it to place and operate video gaming devices in the Kettle by May 26, 1994, their agreement would be canceled and Jordan would contract with another owner for the placement of the devices.
Jordan entered into a device placement agreement with Goudeau, Inc. (“Goudeau”) which was dated April 26, 1994 although Jordan and representatives of Goudeau stated that the contract was entered into and should have been dated May 26, 1994.-The evidence showed that the state authorities issued an owner’s license to HVP on May 24, 1994 although the testimony was disputed as to whether HVP had received the license in the mail prior to the May 26 deadline set by Jordan. Head testified that HVP received the license through the mail on May 26, 1994 and immediately contacted Jordan who informed him that a contract had already been signed with Goudeau. Jordan testified that on May 26, 1994, he contacted Head who stated that HVP had not received its license.
After receiving its video gaming device owner’s license, HVP filed suit on October 5, 1995 seeking damages from Jordan, d/b/a the Kettle, for breach of the April 7, 1994 contract. At some point after filing its action, HVP learned that the Kettle was actually operated under the name of Jordan, Inc. and, believing Jordan was acting as a non-disclosed agent for Jordan, Inc., HVP amended its petition to add Jordan, Inc. as a defendant.

Trial Court’s Ruling

Following a two-day bench trial, the trial court, Judge Benjamin Jones, set forth extensive written reasons for his ruling in which he determined a breach of lathe lease contract had occurred and awarded HVP damages. The court found that the April 7, 1994 contract gave HVP the exclusive right for a three-year period to place video poker machines at the Kettle, subject to the suspensive condition of Jordan and HVP receiving appropriate state licensing. In determining that Jordan reasonably believed there had been a modification to the contract by his May 12 telephone conversation with Head, Judge Jones then states:
[T]he Court must now resolve what it was that constituted the suspensive condition after the modification in the taped conversation.... Despite the fact that Mr. Jordan felt the need to move swiftly in placement of the machines after he received his license, the Court is reminded that at the time that the contract was originally confected, it was obvious to him as well as to Mr. Head that it would be up to the state police to investigate the applications and to issue the licenses, and both knew the dates of issuance were not within the control of either party. Another matter that is not in control of either party is delivery of the mail; so, if a license is issued (typed) on a certain date state officials must still place the license properly addressed and *949 with proper postage in the mail stream; when it is received also depends upon when the U.S. Postal Service worker actually delivers the mail ... [T]he Court finds from the evidence that the suspensive condition was only the issuance of the license to Head’s Video, and did not include a condition that the license be actually received in hand by Mr. Head by May 26, 1994. As a consequence, the Court finds that upon the issuance of the license by the State police to Head’s Video on the 24th of May, 1994, the remaining suspensive condition had been fulfilled and ... the contract became effective on that date ... [T]he Court finds that Mr. Head and Mrs. Head are more credible in their testimony concerning the actual receipt of the license by them on the 26th of May 1994.
The trial court then expressed concern with the contract entered into between Jordan and Goudeau. The court noted that for the contract to have been signed on May 26, 1994, the parties would, at a prior time, have had to negotiate it, type it and prepare it for signature. The court also found that the contract with Goudeau provided Jordan with “tens of thousands of dollars of greater revenue to him than he would have received” had he honored the contract with HVP.
In further measuring the credibility of the parties, the court determined that Jordan had not testified truthfully concerning the work HVP had done to fulfill its 1 obligations under the April 7, 1994 contract including the installation of the booth to house the video poker machines. The court summarized its conclusions as follows:
The above evidence contributed to the Court’s feel for this case and the Court’s conclusion that Mr. Jordan was not operating in good faith and was very, very interesting [sic] in taking advantage of the deal with Goudeau’s that was more likely than not confected prior to the deadlines that had been given for Head’s Video to secure a license. The sense the Court has from the evidence is that Mr. Jordan was engaged in a course of dealings with Goudeau intended to undermine his obligations under the contract with Head’s Video Poker Company Incorporated, even if Head’s became licensed by the state police ... Based on the above analysis, the Court finds that Mr. Jordan did not act in good faith in this matter and that he breached the April 7th contract with Head’s Video Poker, even as modified in the taped conversation ...
In calculating damages, the trial court looked at a similar situation addressed by the court in Louisiana Gaming v. Jerry’s Package Liquor Store, Inc., 94-1189 (La. App. 3d Cir.3/1/95), 651 So.2d 481. In that case, the court determined damages based on the amount of receipts actually brought in by the competitor who had been allowed to place video poker machines in the defendant’s business establishment. Judge Jones then set forth in his written reasons, “Accordingly, it would appear that the proper way to determine damages in this case would be to determine the cost of operation over the active term of the contract that would have been incurred by Mr. Head, minus the cost for the booth and phone line, and to subtract that figure from the amount of profits that Head’s would have received had the contract not been breached.”
The trial court determined that HVP would have incurred monthly expenses of $2,851.93 in operating the machines from June 1994 through April 7,1997, the end of the contract term. While admitting the speculative nature of assuming that HVP would have produced the same revenue generated by Goudeau, the trial court found that this method was consistent with applying the liquidated damages clause | ¡¡contained in the contract and was an appropriate way of calculating gross gaming revenue which would have been produced during the contract term. The trial court thus calculated from the Goudeau revenues the net, after-tax, revenue HVP *950 would have received based on its profit percentage contained in the April 7, 1994 lease, deducted the expenses which would have been incurred from operating the video poker machines and rendered judgment in favor of HVP for $201,926.58 plus legal interest. At a post-trial hearing, the trial court fixed the attorney’s fees due to HVP under the contract at $15,775 and court costs at $2,142.45 with final judgment being entered on May 11,1998.

April 7, 1991 Contract

Jordan first asserts that the trial court erred in finding that the parties were governed by the April 7, 1994 written lease rather than the general provisions of an oral agreement entered into between the parties prior to that date. Nevertheless, in his testimony at trial, Jordan stated that prior to April 7,1994, he had no agreement with Head or HVP to place video poker machines at the Kettle. Moreover, in various pleadings, Jordan admitted the existence of the April 7,1994 contract.
From our review of the testimony of Jordan and Head, we find no indication that in their negotiations leading up to the signing of the April 7 lease, the parties had reached a meeting of the minds for any specific term for the lease arrangement which they were discussing. We therefore find no merit in Jordan’s argument that the provisions of a previously entered oral agreement should control.

Term Provision

In his second and related assignment of error, Jordan argues that the above quoted provision for the three-year lease term was conditioned by the concluding phrase, “if appropriate.” Citing Civil Code article 1770, Jordan argues that this condition remained solely within the whim of himself as lessor, destroying the | ^obligation for a fixed three-year term. HVP counters that the “if appropriate” language was simply a recognition of the suspensive condition for the parties to receive their respective state licenses.
The Louisiana Civil Code provides that the interpretation of a contract is the determination of the common intent of the parties. La. C.C. art.2045. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art.2050. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art.2046; Ochsner Clinic v. Maxicare Louisiana, Inc., 95-959 (La.App. 5th Cir.3/26/96), 672 So.2d 979. However, a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, and the conduct of the parties before and after the formation of the contract. La. C.C. art.2053. When the terms of a written contract are susceptible to more than one interpretation, or where there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, extrinsic evidence is admissible to clarify the ambiguity or to show the parties’ intent. Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087 (La.1981); McDuffie v. Riverwood Intern. Corp., 27,-292 (La.App.2d Cir.8/23/95), 660 So.2d 158; Doyal v. Pickett, 628 So.2d 184 (La.App.2d Cir.1993). Such intent is to be determined in accordance with the plain, ordinary and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable and fair basis. Lindsey v. Poole, 579 So.2d 1145 (La.App. 2d Cir.1991), writ denied, 588 So.2d 100 (La.1991).
Because of the uncertainty of the meaning of the tagged-on phrase “if appropriate” in relation to the clear fixing of a set three-year term by the initial 17portion of the same sentence, we find it appropriate to search for indications of the parties’ common intent from the overall contract and the extrinsic evidence of their dealings and conduct in relation to the agreement. Head could offer no explanation when *951 asked at trial regarding the purpose of the “if appropriate” language. Nevertheless, at the time of the April 7 lease, he had begun making an investment in the video poker booth constructed at the Kettle, he was making the effort to obtain licensing, and he was preparing to make the substantial investment for the purchase of video poker machines for his newly established corporate endeavor. Those efforts demonstrate no intent to allow the term of the agreement to operate solely upon the whim of Jordan or on a month-to-month basis contrary to the contract’s expression of the three-year term.
Though he now raises the “if appropriate” clause as an escape from a binding term for the lease, Jordan was not questioned at trial regarding his understanding of the clause at the time of the April 7 execution of the lease. Instead, we find the most revealing evidence of the parties’ intent for a three-year term to be Jordan’s May 12, 1994 recorded telephone call to Head. In the conversation, Jordan persisted in seeking a two-week deadline regarding HVP’s pending licensing application which he required to be met in order to prevent the contract’s termination. At two points in the conversation, Jordan threatened legal action and “to go to court” in his effort to have Head agree to the May 26 deadline. By this conduct, Jordan attempted to obtain an early termination of the fixed-term agreement. Jordan knew he was bound under a three-year lease but sought, as reviewed by the trial court, to modify and amend the agreement to allow his early exit from the contract if HVP’s license was not granted by May 26.
The parties’ conduct in relation to the contract reveals a common intent, and we find that a three-year lease was intended. La. C.C. art.2053. We further agree | ¿with the trial court’s holding that the modification of the parties’ agreement to require the licensing of HVP by May 26 was fulfilled May 24 when the state issued a gaming device owner’s license to HVP. Accordingly, Jordan thereafter breached his obligations under the lease to deliver the lease premises to HVP and to allow for the peaceable possession of the premises during tthe term of the lease. La. C.C. art. 2692.

Damages

The April 7, 1994 lease contains a provision for liquidated damages that upon a breach by Jordan, HVP could elect to terminate the agreement, remove its equipment and seek stipulated damages in a sum equal to HVP’s average weekly share of the coin boxes prior to the breach, multiplied by the number of weeks remaining in the unexpired term of the contract, plus reasonable attorney’s fees and court costs. Jordan asserts that the trial court erred in using this formula to calculate damages when the video poker machines had never been installed and no average weekly amount generated by the operation of the gaming devices had ever occurred.[1] While Jordan is correct that the stated method for the calculation of stipulated damages was impossible to apply in this instance, such impossibility was caused by Jordan’s breach of the contract. Though the stipulated damages provision may fail or in this case be impossible to apply, the principal obligation of the lessor remains owed to the lessee and damages of lost profits for the breach of that obligation may be proven. La. C.C. arts.2006, 1995 and 2696.
Although the trial court could not apply the stipulated damage clause, the Civil Code indicates that the lessor is answerable for the damage and loss which |9the lessee sustains “by the interruption of the lease.” La. C.C. art. 2696. In this case, HVP’s rights to the possession of the lease *952 premises were interrupted due to Jordan’s failure to deliver the lease premises to HVP after the time it obtained its license. This resulted in a breach of the lessor’s obligations to deliver the premises and to maintain the lessee in peaceable possession. La. C.C. art. 2692(1) and (2). With its booth in the Kettle already built, HVP was effectively evicted.
Under the jurisprudence applying La. C.C. art. 2696, HVP’s loss of profits from the benefits of the favorable lease location at the Kettle may be compensated so long as the award is not speculative. Tidwell v. Meyer Bros., 160 La. 778, 107 So. 571 (1926); Dehan v. Youree, 161 La. 806, 109 So. 498 (1926). Also, if a gain is realized by the activity of another who profits from the lease premises to the detriment of the evicted lessee, the court may consider such gain in awarding damages to the lessee. Jefferson Lake Sulphur Co. v. State, 213 La. 1, 34 So.2d 331 (1947); see also, Louisiana Gaming, supra. Generally, damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La. C.C. art.1995. When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. C.C. art.1999.
In this case, the evidence indicated that the Kettle, which was open for business twenty-four hours a day, was a very favorable location for the operation of video poker machines. Thus, while the damages to HVP are not able to be precisely measured, considering the term of the April 7, 1994 contract, using the proceeds generated by the machines placed in the Kettle by Goudeau, applying the contractual percentage of the proceeds which would have been received by HVP and subtracting the expenses of operating the machines from that sum appears to |inbe the logical and appropriate way of computing the damages. The trial court did not abuse its great discretion in assessing these damages against Jordan.

Solidary Liability

The trial court rendered judgment against Clay Brooks Jordan, individually, d/b/a the Kettle. HVP asserts in its answer to this appeal that Jordan, Inc. should be held solidarity liable with Jordan for the damages because Jordan was acting as the undisclosed agent of Jordan, Inc. See, La. C.C. arts. 3017 and 3020. Jordan signed the April 7, 1994 contract individually, not in a representative capacity as an officer of Jordan, Inc. It was only after this litigation was initiated that HVP asserted that the Kettle was an asset of Jordan, Inc., and HVP amended its petition to include Jordan, Inc. as a defendant.
Solidarity of obligation shall not be presumed; a solidary obligation arises from a clear expression of the parties’ intent or from the law. La. C.C. art. 1796. In many cases involving an alleged undisclosed agent, the agent seeks to escape personal liability and bears the burden of proving that he disclosed the agency relationship. Wilkinson v. Sweeney, 532 So.2d 243 (La.App. 3d Cir.1988); Century Pools, Inc. v. Pinkstaff 598 So.2d 1189 (La.App. 5th Cir.1992). Here, Jordan did not dispute his personal dealings with Head and did not seek the corporate shield of liability. Therefore, the burden of proof was on HVP to show that Jordan was acting as the undisclosed agent of Jordan, Inc.
From our review of the evidence, we find insufficient proof of an agency relationship. First, despite HVP’s allegation that the Kettle was owned by Jordan, Inc., the record contains no proof of ownership. Additionally, in a strict sense, Jordan was not required to be the owner of the Kettle to lease and warrant the possession and enjoyment'of the space at the restaurant. La. C.C. arts. 2681 and 2682. Next, although it can easily be inferred that Jordan, Inc. is a closely held | n corporation of Jordan, there was still no showing of Jordan, Inc.’s interest in the lease contract and Jordan’s authority to *953 act on behalf of Jordan, Inc. in the contract. The only proof offered at trial was the testimony of Jordan and Head that Jordan, Inc. was never discussed in their negotiations as a possible party at interest. This proof was therefore insufficient to demonstrate that the obligations of the lease were intended as the obligations of Jordan, Inc. because of an undisclosed agency relationship. With this meager record regarding this issue, the trial court properly refused to hold the defendant, Jordan, Inc., liable.

Conclusion

The trial court’s judgment awarding damages in favor of Head’s Video Poker Company, Inc. and against Clay Brooks Jordan d/b/a Kettle Restaurant, individually, together with interest, attorney’s fees and court costs is affirmed. Costs of this appeal are assessed to appellant.
AFFIRMED.

. A close reading of the trial court's reasons for judgment reveals that while the method used by the court is consistent with the stipulated damages clause contained in the contract, the trial court determined the amount of lost profits to HVP based upon the subsequent video poker proceeds obtained by Gou-deau.